Brian J. **WARTON**, Plaintiff,

v.

**NEW FAIRFIELD BOARD OF EDUCATION, Defendant.**

**No. 3:00CV1235(WWE).**

United States District Court, D. Connecticut.

July 16, 2002.

---

David C. Shaw, Andrew Alan Feinstein, Law Offices of David C. Shaw, Bloomfield, CT, for Plaintiff.

Christopher M. Vossler, Melinda A. Powell, Howd & Ludorf, Michael J. Rose, Howd & Ludorf, Hartford, CT, for Defendant.

### RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT

EGINTON, Senior District Judge.

This is an appeal from the decision of a due process administrative hearing officer, which partly affirmed the Individualized Education Plan ("IEP") for the plaintiff, Brian Warton, as proposed by the defendant, New Fairfield Board of Education.

The parties have filed cross motions for summary judgment. Plaintiff seeks reversal of the hearing officer's decision relative to plaintiff's placement in the special education "multicategorical" program. Defendant asks this Court to affirm the hearing officer's decision, and to grant summary judgment on plaintiff's allegations of a violation of the Family Educational Rights and Privacy Act ["FERPA"].

For the following reasons, the plaintiff's motion will be granted as to the request for reversal of the hearing officer's decision relative to plaintiff's placement in the multicategorical program; defendant's motion for summary judgment will be granted only as to plaintiff's claim of violation of the FERPA.

### Background

The parties have filed briefs, statements of fact pursuant to Local Rule 9(c) and exhibits, including the administrative record. These materials reflect that the following facts are not in dispute.

Plaintiff, is a fifteen year old boy, who has some neurological impairments of unknown etiology, and who has qualified for special education services from New Fairfield Public Schools since September, 1990, when he was three years old. He has had hyperactivity, perserverative behaviors, speech and language delays, apparent difficulty forming abstract concepts, and impaired comprehension.

In 1996, at a Planning and Placement Team ("PPT") meeting, the defendant School Board proposed that an educational consultant be retained to address plaintiff's academic needs and placement. The School Board proposed three consultants, from which list the parents chose Dr. Judith Itzkowitz. The Board asked Dr. Itzkowitz to identify plaintiff's functional levels in terms of academics and living skills, to recommend curricular materials, and to make suggestions concerning plaintiff's inattention.

On June 17, 1996, Dr. Itzkowitz submitted an educational evaluation of plaintiff, which stated:

Brian is an engaging child who has been identified as neurologically impaired. I see him as a child who has considerable potential for learning; currently, his sensory needs, behavioral challenges, and his developing system of verbal communication interfere with consistent performance and learning. Many of the behaviors observed closely correspond to those characteristics of children with pervasive developmental disorder and autism. In learning about Brian, I would support the team in exploring how he could be educated in a general education setting for more of his school day with the appropriate supplementary aids and services.

According to Dr. Itzkowitz, plaintiff should have placement in an inclusive program that would entail "high expectations" and "be modified based upon his gifts, capabilities, and needs." Dr. Itzkowitz warned against "dumping" plaintiff into a general education program without adequate support. At the same time, she remarked that plaintiff "is a child who has considerable potential given appropriate supports...."

On September 20, 1997, Dr. Armin Thies conducted a neuropsychological evaluation of plaintiff at the request of the parents. According to Dr. Thies' examination, "levels of performance across virtually all measures of mental abilities were in the borderline to mildly deficient range..." and "measures of learning generally yielded scores in the broad average range."

Dr. Thies indicated that plaintiff was a nonverbal learner and suggested experiential learning, use of physical objects, manipulatives, and graphic representation of information to address plaintiff's learning needs. He recommended "individualized instruction in a highly structured class with a highly structured curriculum" for "all major, content subjects."

Plaintiff's educational program for his fifth grade school year was based on an "IEP", which characterized plaintiff's disability as global developmental delay. The

IEP provided for regular education in math, homeroom and special classes, such as art and music. All other academic subjects were in a self-contained special education classroom environment. The IEP also provided for a paraprofessional to accompany him, extended time to complete his work, and study material modifications.

During his fifth grade year, plaintiff met sixteen of the forty-nine education goals and objectives set for him in his IEP.

In Spring, 1999, the School Board proposed plaintiff's inclusion in a life skills program for special education students. The proposed program included "functional academics," and "life skills" classes.

Functional math instruction entails practice in the areas of counting money, telling time, and using a calculator. Functional reading instruction focuses on identifying survival signs and environmental sight words, or improving decoding and comprehension skills. Functional reading classes emphasize increasing the student's "ability to read and interpret environmental print such as menus, food labels, recipes, and simple instructions." Functional writing instruction ranges from teaching lower functioning students to print their first and last name correctly, to teaching higher functioning students to compose friendly letters and write down phone messages.

Prevocational or life skills include instruction in light housekeeping, hygiene and grooming, and food preparation.

The School Board proposed that plaintiff devote half of his school day to life skills and the other half to "functional academics" and special services, including physical therapy, occupational therapy, adaptive physical education, music, art and health. The school staff stated that, "[l]ow cognitive ability, coupled with neurological, speech, language, and social/emotional disabilities cause Brian to become easily anxious and overwhelmed. . . ."

Plaintiff's parents believed plaintiff would not reach his full potential if limited to instruction in functional academics and life skills, and if restricted in access to age appropriate models and materials.

During four PPT meetings in the summer of 1999, the parents and the School Board continued to disagree upon the proper placement for the plaintiff in his sixth grade year. When it appeared that an agreed upon IEP for the plaintiff would not be accomplished, plaintiff's mother asked that plaintiff be placed in a mainstream sixth grade class pending completion of an agreed upon IEP.

Dr. Jon Walek, Director of Pupil Personnel for the School Board, agreed to place plaintiff in mainstream classes, pending an agreed upon IEP. Relative to this placement, Dr. Walek wrote that he would ask that plaintiff "have one period per day with Mrs. Linck, Special Education teacher so that she may assist him in organizing the notes, content and assignments. . . ." He also wrote that he assumed that plaintiff would "receive his related service supports. . . ."

In the first week of September, plaintiff commenced his sixth grade year in regular education classes. At that time, plaintiff did not have the assistance of a paraprofessional.

Plaintiff's mother asked that she be allowed to shadow her son in school to determine appropriate accommodations for his success in a mainstream program. As she stated in her letter dated August 27, 1999, "[a]bsent some types of support system the school system is setting Brian up for a very unpleasant transition and one which may jeopardize his ability to enter the mainstream program following the PPT meeting."

After she observed plaintiff's program at school during two days, she wrote to the principal to suggest accommodations and to confirm her understanding that the school was working on hiring an aide for the plaintiff.

At a PPT meeting on September 13, 1999, the School Board proposed that plaintiff be placed in a regular education environment only for special classes and lunch. It rejected the placement of plaintiff in a general education program with supplementary aids and services.

At a PPT meeting on September 24, 1999, the School Board informed the parents that it intended to place plaintiff in a self contained special education classroom with supports. Plaintiff's teachers reported that plaintiff had difficulty completing classroom assignments and following directions.

Plaintiff's parents countered that plaintiff should be placed in a mainstream classroom with supplementary aids and supports. Plaintiff's parents filed for due process that day.

On September 22, 1999, the School Board provided plaintiff with a paraprofessional to assist him in his regular classes.

In an interim pre-due process hearing order dated October 13, 1999, the hearing officer ruled that (1) "the student's stay-put placement is the regular educational setting with the necessary supports as identified prior to the beginning of the 1999–2000 school year...", and (2) the burden of proof rested with parties who had requested the due process hearing, in this instance, the parents and student.

On November 12, 1999, the hearing officer ruled that she would undertake an observation of the student in the classroom. On November 14, the parents requested that the hearing officer observe the School Board's "multicategorical and other special education classrooms," which request the hearing officer granted. These observations took place on November 17, and December 15, 1999.

The due process hearing commenced on November 17, 1999. Plaintiff's mother testified that, during plaintiff's placement in the special education multicategorical program, he had few opportunities to have meaningful interaction with his mainstream peers. She had observed that plaintiff's mainstream experience was limited to (1) seventeen minutes during a homeroom period, during which time the students were not allowed to speak; (2) lunch at an assigned seat with two other special education children and their paraprofessionals at a table in a lunchroom with 250 other children; and (3) regular mainstream art, music or health class.

She testified further that the skills that plaintiff had previously learned had not been adequately reinforced. She explained that, during plaintiff's fifth grade year, plaintiff had made only minimal reading progress in the self contained classroom. At the same time, plaintiff had received B's in the mainstream math class, and A's in the mainstream health class.

She confirmed her understanding that plaintiff was to have been placed in a mainstream classroom with a one-on-one paraprofessional. She agreed that, absent such supports, the teachers' observations that plaintiff was not properly placed in a mainstream classroom was "probably accurate."

Thereafter, at a PPT meeting on December 9, 1999, the School Board reported that plaintiff was failing math, science, social studies and reading/language arts. No goals or objectives were developed at that meeting.

The due process hearing continued on December 15, 1999. Plaintiff's sixth grade

social studies teacher, Stash Pawlinski, testified that plaintiff appeared stressed and withdrawn in his class comprising 25 students. He believed that stress inhibited plaintiff from performing tasks that were within his abilities. He stated that he had made accommodations for the plaintiff, which included placing the plaintiff at the front of the class next to a computer. He also testified that plaintiff had been assisted by a paraprofessional during his class.

Mary Ann Zoeller, plaintiff's sixth grade reading and writing teacher, testified that modifications to assist plaintiff in her class included access to a paraprofessional, and accommodations to the reading selections, testing, and homework material. Ms. Zoeller explained that plaintiff had access to a computer but not to a printer in her class, and that, in small group exercises, plaintiff was paired with one particular child with whom he worked well. Based upon her observation of plaintiff in the multicategorical room during a non-academic support period, Ms. Zoeller stated that she felt plaintiff would be appropriately placed in the multicategorical room. Ms. Zoeller answered that she had not observed whether plaintiff would exhibit less stress in an an academic self-contained special education setting, as opposed to a small group in a mainstream classroom.

At the January 4, 2000 due process hearing, Ms. Zoeller testified that plaintiff was graded as possibly failing due to low grades and lack of class attention. She had observed plaintiff's knowledge of certain materials but had never witnessed application of that information at a regular sixth grade student level. She had been told by Dr. Walek to treat plaintiff as a regular education student, and she had never received any complaints from any student that plaintiff had interfered with that student's ability to learn.

Peter Fischer, plaintiff's sixth grade science teacher, testified that plaintiff was to be treated as a regular student as opposed to a special education student with specific modifications. He stated that plaintiff had learned some material from his class. However, he felt that he had had a hard time communicating with the plaintiff, and that plaintiff's presence in class was disruptive due to his nervousness and inability to work with a group. Mr. Fischer explained further that he "was sorry to let" plaintiff work with the group on projects that involved potentially dangerous chemicals or electricity.

Plaintiff's paraprofessional testified that she began work as plaintiff's paraprofessional after the beginning of the school year on September 22. She confirmed that she had not been informed of the degree of plaintiff's handicaps prior to accepting the position. She explained that she received very little, if any, training on how to deal with plaintiff's disabilities, and that she had never worked as an aide to a disabled child before. She stated further that she no longer wanted to continue her work as plaintiff's paraprofessional.

The next day, plaintiff's father asked that she be removed from her position as plaintiff's aide, which request was accommodated.

On January 6, 2000, the hearing officer issued an order, directing the School Board to provide a computer in each of the student's four academic subject classrooms, and to make a printer available to the plaintiff prior to the end of each school day.

At the request of plaintiff's parents, a PPT meeting was held on January 11, 2000, in order to discuss replacement of the paraprofessional. The parents were

informed that they could not be involved in the interview process or have contact with any aide unless the aide was a certified teacher.

On January 12, 2000, the due process hearing resumed with the testimony of Dr. Jon Walek, Director of Pupil Services, who testified that socialization with other mainstream students should be an important component of plaintiff's education. He confirmed that the plaintiff's parents had repeatedly requested that accommodations and modifications be made for the plaintiff in the mainstream placement, but that there had been no agreed upon IEP developed to facilitate plaintiff's education in the mainstream.

At the January 27, 2000 due process hearing, James Rice, the Principal of the New Fairfield Middle School, stated that most of the paraprofessional training was administered informally by him. His testimony reflected that he had no academic degree in special education.

At the due process hearings on February 29, and March 7, 2000, plaintiff's father testified that the school district ignored the outside expert recommendations that plaintiff be placed in the mainstream. He explained that several experts held the opinion that plaintiff had until approximately age fourteen to learn abstract concepts. After that age, plaintiff would be able to build upon new abstract concepts, but would be unlikely to grasp new concepts. Plaintiff's father also observed that plaintiff had made progress from a "peer group standpoint" due to his interaction in school.

On March 13, 2000, Georgiana Ferrara, plaintiff's sixth grade math teacher, testified that she had tested plaintiff one-on-one, modified some of the questions to plaintiff's level of understanding, and sat plaintiff in the first or second row. She stated that plaintiff was failing her class,

had exhibited frustration and nervousness, and had "no auditory support for any kind of thinking, the kind of thinking that is going on in his mind." However, he had demonstrated success with his time tables, subtraction, addition, and cutting a shape into thirds. She also commented that plaintiff handed in very strong homework assignments written in his mother's handwriting. Ms. Ferrara stated that no modifications specific to the plaintiff's needs had been given to her, except for one IEP from his fifth grade year.

Susan Portnoy, plaintiff's teacher in the multicategorical program for the third, fourth, and fifth grade, testified that plaintiff was in the special education self-contained program for reading, language arts, social studies, and science, and in the mainstream class with a paraprofessional for math. According to Ms. Portnoy, during his three years in the multicategorical room, plaintiff only progressed from reading at a first grade level to a second grade reading level. She stated that plaintiff had good decoding skills and was good at spelling, but had difficulty with vocabulary and definitions.

On March 20, 2000, Cynthia Ferguson, the School Board's school pyschologist, testified that she had evaluated the plaintiff prior to his fifth grade year. She stated that her test findings were largely consistent with Dr. Thies' report, and that plaintiff tended to achieve above his cognitive level. She interpreted Dr. Thies' recommendation—that plaintiff needed a structured class, with individualized instruction—to require a special education placement, rather than a mainstream placement with appropriate supports. However, she admitted that Dr. Thies' report specified neither a special education nor regular education curriculum.

She recalled that, in 1996, the PPT had rejected Dr. Itzkowitz's recommendation that the PPT consider what accommodations would enable plaintiff to be placed in the mainstream second grade classroom. She remembered that the PPT focused on third grade transition issues. She stated that she still believed the multicategorical program to be plaintiff's appropriate placement, and that a mainstream class could not be modified to meet plaintiff's needs. Her testimony reflected that she had not observed plaintiff in the sixth grade and was not familiar with middle school curriculum or class structure.

On May 3, 2000, the hearing officer issued her ruling, ordering plaintiff's placement in a self-contained special education room or multicategorical program for all of his academic subjects except math, homeroom, art, music, health, lunch and any other mainstream special classes. The hearing officer also ordered that a consultant be provided to train a paraprofessional to assist plaintiff, that a computer and printer be provided in each class, and that related services and testing modifications be provided.

The hearing officer observed:

Upon their total rejection of the multicategorical program, the parents insisted that the student be completely mainstreamed, expecting that the Board would provide supplementary aids and services to assist the student. The Board responded by placing the student in mainstream classes for reading and language arts, social studies, math and science, in addition to music, homeroom, and lunch with no guidance or support for the regular education teachers or the grossly unprepared, untrained paraprofessional. Based on the facts and pertinent law, neither the parents' demand for complete mainstreaming nor the Board's negligible efforts to provide sup-

plementary aids or services in the mainstream setting was a sound decision....Despite the fact that the 1999–2000 school year began on or about September 1, 1999, and the Board personnel knew that the student would be attending the Board Middle School, there was no paraprofessional available to work with the student until September 22, 1999. Prior to being hired, the paraprofessional was not told about the student's disabilities and testified that she would not have taken the job had she known....The student's placement in the mainstream sixth grade classes has been lacking in all of the recommendations made by Dr. Thies based upon his evaluation of the student....

In support of her finding against a mainstream placement with appropriate supports, the hearing officer wrote:

It is not enough to simply *expose* the student to typical peers and the mainstream environment and, thereby, *hope* for trivial advancement. Based on all the evidence, it is the conclusion of the hearing officer that the student's educational, socialization, and behavioral needs cannot be satisfactorily met in the full-time regular education classroom environment, even if the Board had provided or were to provide sufficient supplemental aids and services. The evidence has shown that it is simply too overwhelming, too complex, too distracting, and requires too much of the student and the regular education teachers at this time. Since a free appropriate public education does not mean the absolutely best or potential-maximizing education for the individual child, the focus must be on the Board's proposed placement, "not on the alternative that the family preferred."

The hearing officer rejected the plaintiff's arguments that the School Board had

violated any procedural requirements of the IDEA.

On May 25, 2000, at a PPT meeting, the School Board proposed an IEP providing that plaintiff would be placed in 18.75 hours of special education per week, mainstream education classes of math and specials for 7.5 hours per week, and related services, such as speech, language, occupational, and physical therapy and adaptive physical education for 2.75 hours per week. The parents rejected this IEP.

On June 12, 2000, the parents filed suit in Connecticut Superior Court. Defendant removed the case to federal court.

On August 21, 2000, the plaintiff filed for a preliminary injunction to continue his placement in the regular education setting with appropriate supplementary aids and supports pursuant to the stay put placement provision of the IDEA. The Court granted that injunction on November 8, 2000. On November 16, 2000, plaintiff was removed from the self contained special education classroom and placed in the regular mainstream classroom. Dr. Ann Majure was hired to provide training to school staff regarding plaintiff.

On November 20, 2000, the School Board implemented a new IEP to comply with this Court's order to place plaintiff in a regular education classroom with appropriate supplementary aids and supports for the remainder of his seventh grade year.

Functioning under this IEP, plaintiff excelled. He largely received A's and B's in his classes, was honored as science "Student of the Month" in February, 2001, and was reported by one of his teachers to have "blossomed like a flower."

Dr. Itzkowitz's independent educational program evaluation dated August 12, 2001, states:

When we consider the educational program recommended for the sixth grade, the decision for Brian to be in the "multicategorical classroom" [sic] and "life skills program" was not based on best practice in educating students with similar disabilities. It was based upon the premise that students with moderate to significant disabilities could not benefit from placement in general education with supplementary aids and services. When Brian was placed in sixth grade in the general education setting, he was "dumped" into the general education setting....A review of the comments from the performance reports and other comments from members of the sixth grade team clearly convey that staff did not understand the rationale behind Brian's placement in general education, the specific nature of his disability, and the accommodations and supports he needed to benefit from placement in general education.

In his eighth grade year, plaintiff has continued placement in the mainstream classroom with supplementary aids. On his October 26, 2001 report card, plaintiff received A's in all of his subjects, and he has been noted in a local newspaper as achieving high honors.

## DISCUSSION

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. *American International Group, Inc. v. London American International Corp.*, 664 F.2d 348, 351 (2d Cir.1981). In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which it has the burden of proof, then summary judgment is appropriate. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

## A. *IDEA*

Under the IDEA, when a federal court reviews the findings and conclusions reached in a state administrative proceeding, it must base its decision on the preponderance of the evidence, after reviewing the administrative record and, at a party's request, any additional evidence presented. 20 U.S.C. § 1415(i)(2)(B); *M.S. v. Bd. of Educ. of the City Sch. Dist. of the City of Yonkers*, 231 F.3d 96, 102 (2d Cir.2000), *cert. denied*, 532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001). This is not an invitation to the courts to substitute "their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).

*Rowley* instructs that the reviewing court must give "due weight" to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy. The traditional test of findings being binding on the court if supported by substantial evidence or a preponderance of the evidence does not apply when according due weight to the hearing officer's findings. *Town of Burlington v. Dep't of Educ. Of Mass.*, 736 F.2d 773, 791 (1st Cir.1984), *affirmed on other grounds*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). *Burlington* elaborates that, after careful consideration of the hearing officer's findings on each material issue, "the court is free to accept or reject the findings in part or in whole." Reviewing courts, however, need not give due weight to conclusions of law concerning the "proper interpretation of the federal statute and its requirements." *J.B. v. Killingly Bd. of Educ.*, 990 F.Supp. 57, 67 (D.Conn.1997).

Summary judgement is a pragmatic procedural mechanism in the federal rules for resolving IDEA actions. *Wall v. Mattituck–Cutchogue Sch. Dist.*, 945 F.Supp. 501, 508 (E.D.N.Y.1996). *Wall* instructs that the inquiry is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed.

## B. *Review of Hearing Officer's Decision*

*Rowley* provides that the Court should first review whether the board complied with the procedures set forth in the IDEA; and then determine whether the individualized education program developed through the IDEA's procedures was reasonably calculated to enable the child to

receive educational benefits. *Rowley,* 458 U.S. at 206–207, 102 S.Ct. 3034.

The Second Circuit has established that the School Board shoulders the burden of proof as to compliance with the IDEA and appropriateness of the placement. *M.S.,* 231 F.3d at 101.

Although the hearing officer erred when she stated that the the burden of proof was placed on the parents, her opinion states that the School Board had the burden of proof on the issue of compliance with the Act's mainstreaming preference. As will be discussed below in this decision, the hearing officer's error on the burden of proof did not affect her decision as to defendant's compliance with the Act's procedural requirements. However, as discussed further, it is not clear whether the hearing officer properly applied the burden of proof on the issue of compliance with the Act's substantive mainstreaming preference.

### 1. *Procedural Compliance with the IDEA*

█ Plaintiff asserts that the hearing officer erred in finding that the School Board had complied with the procedures required by the IDEA. Plaintiff claims that the School Board prohibited the parents from participating in "a meaningful way" during the PPT meetings to develop plaintiff's IEP. Specifically, plaintiff contends that the hearing officer erred by rejecting plaintiff's assertion that (1) the School Board failed to give serious consideration to the parent's proposals prior to determining that plaintiff should be placed in the multicategorical room, (2) the School Board failed to include parental comments with the IEP records, and (3) the School Board improperly changed the student's exit criteria from special education without the parents' consent.

The Court's procedural inquiry is "no mere formality." *Walczak v. Florida Union Free School Dist.,* 142 F.3d 119, 122 (2d Cir.1998). The Supreme Court has stated that "adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *Rowley,* 458 U.S. at 206, 102 S.Ct. 3034.

An IEP is a procedural mechanism that protects a child's rights to a free appropriate education. 20 U.S.C. § 1414(d). An IEP is a tailored written outline of the unique educational needs of an individual student and the services required to meet those needs. *Walczak,* 142 F.3d at 122. In designing the child's IEP, the PPT must include a qualified special education representative of the school board, the child's teacher, and one or more of the child's parents, and may also include individuals who evaluate the child or provide special education services to the child. *P.J. v. State of Connecticut Bd. of Education,* 788 F.Supp. 673, 676 n. 1 (D.Conn. 1992).

As the Supreme Court elaborated, Congress sought to protect individual children by providing for parental involvement in the development of state plans and policies and in the formulation of the child's IEP. *Rowley,* 458 U.S. at 208, 102 S.Ct. 3034.

Pursuant to Connecticut law, after a child is initially identified as learning disabled, the PPT develops a disabled child's IEP during a PPT meeting. *J.B.,* 990 F.Supp. at 66. As stated in *J.B.,* the IEP must include statements of a disabled child's "present level of education, instructional objectives and criteria for determining if the child is meeting these goals, specific educational services to be provided to each disabled child, and any necessary transition services, along with a statement of interagency responsibilities, for each

child beginning no later than age sixteen." Section 1415(b) provides that the child's parents or guardians must be given prior written notice of any proposed change in the identification, evaluation, or educational placement of the child.

The hearing officer rejected the plaintiff's arguments that they had been prevented from having "meaningful participation" in the process. In her decision, she explained that "there is no statute or regulation which requires that there be minutes of an IEP meeting or that a parents' written statement of disagreement with the team decision ('2A/6A') be attached to any particular document," and that the "sheer volume of exchanged correspondence and proposed goals and objectives as well as the number of IEP meetings convened demonstrates compliance by the Board with the requirements of C.F.R. Section 300.345 and 300.501 regarding parent participation in the process."

The Court finds no error in the hearing officer's conclusion. No mandate exists to compel the School Board to include minutes of the IEP or attach the parents' written statement of disagreement. Review of the administrative record, including the correspondence between the parents and the school, demonstrates that the parents had sufficient opportunity to review the program goals and objectives, and to discuss changes to the draft IEP.

The hearing officer also found that the school board had not committed a procedural violation by changing the plaintiff's exit criteria to "attainment of maximum age" without the consent of the parents. Plaintiff argues that applying exit criteria based on attainment of the maximum age, rather than receipt of a high school diploma, effectively blocks plaintiff from being educated in the regular education environment. This Court agrees with the hearing officer's reasoning that the exit criteria

based on attainment of age ensures plaintiff's maximum entitlement to a free appropriate public education.

As cited by the hearing officer, 34 C.F.R. Section 300.122(a)(3)(ii) provides that if a student graduates but is not awarded a regular high school diploma, that student maintains his eligibility for special education until he ages out or is awarded a regular high school diploma. Similarly, Section 10–76d–1(a)(7) of the Connecticut Agencies Regulations provides that a student who has not received a regular high school diploma continues to be eligible for special education and related services until the end of the school year in which the student turns twenty-one (21) years of age. However, pursuant to 34 C.F.R. Section 300.122(a)(3)(i), the School Board is not obligated to make a free appropriate public education available to a student who has graduated from high school with a regular high school diploma. Thus, age based criteria is most protective of plaintiff's rights.

### 2. *Substantive Review*

■ Plaintiff argues that the hearing officer's decision placing plaintiff in the special education multicategorical program violates the IDEA's mandate that a child be provided with special education and related services in the least restrictive environment consistent with a child's needs. 20 U.S.C. § 1412(a)(5)(A); *Walczak*, 142 F.3d at 132.

Relying exclusively on *Rowley*'s two part test, defendant argues that summary judgment should enter in its favor since (1) it complied with the Act's procedures, and (2) the IEP developed was reasonably calculated to enable the plaintiff to receive educational benefits. Defendant contends that the Court cannot find that plaintiff was denied free access to an appropriate public education unless the School Board

failed to provide a "basic floor of opportunity" and access to appropriate specialized instruction and related services.

As stated in *Rowley*, the IDEA requires that states receiving money under the IDEA must educate handicapped children "with children who are not handicapped" to the maximum extent appropriate. 34 C.F.R. § 300.550(b).[1] The IDEA's preference for mainstreaming "rises to the level of a rebuttable presumption." *Sacramento City Unified School District v. Holland*, 786 F.Supp. 874, 877 (E.D.Cal.1992).

The Fifth Circuit remarked that *Rowley*'s analysis is ill suited for evaluating compliance with the IDEA's mainstream or least restrictive environment ["LRE"] requirement. *Daniel R.R. v. State Bd. Of Educ.*, 874 F.2d 1036 (5th Cir.1989). *Rowley* "demarcates an outer limit to the IDEA's LRE preference," but "does not provide guidance for determining whether, in a specific case, the IDEA's LRE requirement has been met." *A.S. v. Norwalk Board of Education*, 183 F.Supp.2d 534, 540–41 (D.Conn.2002). In *A.S.*, Judge Underhill explained that an extensive body of post-*Rowley* case law offers useful analyses for determining if a child has been mainstreamed to the maximum extent appropriate, and that *"Rowley* itself requires an examination of the adequacy of the services being provided in the mainstream setting."

The two prong test articulated in *Daniel R.R.*, which the hearing officer relied upon in this case, provides that the Court's inquiry into compliance with the IDEA's mainstreaming preference must determine (1) whether education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily, and (2) if it is not possible to achieve a regular classroom placement, whether the school has mainstreamed the child to the maximum extent appropriate.

The Third Circuit, reviewing the analysis of *Daniel R.R.*, elaborated that the Court should consider the following three non-exclusive factors to determine whether education in the regular classroom, with appropriate supports, can be achieved: First, the Court should consider whether the school district made reasonable efforts to accommodate the child in a regular classroom; Second, the Court should compare the educational benefits available to the child in a regular class, with appropriate supplementary aids and services, to the benefits provided in a special education class; Third, the Court should inquire as to the possible negative effects of the inclusion of the child on the education of the other students in the class. *Oberti v. Board of Education of Borough of Clementon Sch. Dist.*, 995 F.2d 1204 (3d Cir.1993). No one factor is dispositive and other considerations may be relevant to a specific case. *See Daniel R.R.*, 874 F.2d at 1048.

The Court notes that these factors are consistent with *Rowley*'s instruction that "if personalized instruction is being provided with sufficient supportive services to permit the child to benefit from the instruction, and other items on the definitional checklist are satisfied, the child is receiving a 'free appropriate public edu-

---

1. 34 C.F.R. 300.550(b) provides:

    Each public agency shall ensure—
    (1) That to the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are nondisabled; and

    (2) That special classes, separate schooling or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

cation' as defined by the Act." *Rowley*, 458 U.S. at 189, 102 S.Ct. 3034.

The hearing officer found that the School Board had "placed the student in mainstream classes without a plan for adjusting the sixth grade curriculum to the student's abilities, without a behavior management plan, without providing adequate special education support to the regular education teachers, and with an untrained paraprofessional or no paraprofessional at all. . . ." The hearing officer held that the "Board has violated the Act's mainstreaming directive while the student's placement has been in the regular education setting at the Board middle school." However, without articulating review of the *Oberti* factors, she concluded that:

> the student's educational, socialization, and behavioral needs cannot be satisfactorily met in the full-time regular education classroom environment, even if the Board had provided or were to provide sufficient supplemental aids and services. The evidence has shown that it is simply too overwhelming, too complex, too distracting, and requires too much of the student and the regular education teachers at this time.

The Court reviews the evidence according to the *Oberti* factors to determine whether the hearing officer erred by concluding that plaintiff's case failed the first prong of *Daniel R.R.*, that he could not be satisfactorily educated in the mainstream. In considering these factors, the Court places the burden of proof on the School Board.[2]

a. *Whether the Board Made Reasonable Efforts to Accommodate the Plaintiff in the Regular Classroom*

Consistent with the hearing officer's decision, the Court's review of the evidence demonstrates that the School Board failed to make reasonable efforts to accommodate the plaintiff in the regular classroom. The record indicates that the PPT process failed to consider what appropriate modifications would be necessary to achieve a mainstream placement, despite Dr. Itzkowitz's recommendation that the team explore how plaintiff could be educated "in a general education setting for more of his school day with the appropriate supplementary aids and services." The testimony of plaintiff's teachers and paraprofessional revealed that plaintiff was considered a regular student in the mainstream rather than a special education student in the mainstream environment. The teachers received little direction from the School Board staff relevant to plaintiff's disability, and appropriate accommodations, other than the list of proposed accommodations provided by plaintiff's mother. Accommodations for teaching methods, class participation, and testing appear to have been developed by the teachers on an *ad hoc* basis. Testimony at the due process hearing also demonstrated that plaintiff did not have consistent access to a computer and printer, which accommodation the hearing officer ordered the School Board to provide on a consistent basis.

Furthermore, no paraprofessional was available to work with the student in the first three weeks of his placement in the mainstream. When the School Board did finally hire a paraprofessional for the plaintiff, it failed to advise her of plaintiff's condition, or to provide her with the necessary training to assist the plaintiff. Plaintiff's experience with the paraprofessional appears to have been unsuccessful.

---

**2.** The Court notes that the hearing officer stated that the School Board had the burden to prove compliance with the Act's mainstreaming requirement.

The School Board's evidence fails to demonstrate that it considered potential accommodations to facilitate a mainstream placement prior to proposing the IEP that was rejected by the parents.

Accordingly, as the hearing officer found, and as the evidence demonstrates, the School Board failed to make reasonable efforts to accommodate the plaintiff in the mainstream setting. This factor weighs particularly heavily against the School Board, since a school that has failed to give consideration to inclusion of a child in a regular class with supplementary aids and modifications has most likely violated the Act's mainstreaming directive. *Oberti,* 995 F.2d at 1216. The IDEA does not permit token gestures to accommodate disabled students. *Daniel R.R.,* 874 F.2d at 1048.

b. *The Educational Benefits Available to the Child in a Regular Class, with Appropriate Supplementary Aids and Services, as Compared to the Benefits Provided in a Special Education Class*

Plaintiff argues that his placement in the multicategorical room would have led to regression or, at least, would not have provided him with the opportunity for a meaningful education. Specifically, plaintiff argues that the hearing officer's conclusion (1) ignores the conclusions and directives made by expert evaluators, (2) ignores the evidence that plaintiff had not previously made progress in the special education class, (3) improperly relies on the testimony of plaintiff's teachers concerning plaintiff's difficulties in the regular education classroom without appropriate supports, and (4) is belied by the evidence of plaintiff's subsequent success in the regular classroom with appropriate supports.

The hearing officer concluded:

The Board's proposed goals and objectives, to be implemented in the multicategorical special education program, including a life skills component, are based on current, objective evaluations and the observations of trained Board personnel. The parent's proposed goals and objectives are not patently inappropriate but, nevertheless, require skill levels the student has not sufficiently or measurably demonstrated.... It is not enough to simply *expose* the student to typical peers and the mainstream environment and, thereby, *hope* for trivial advancement.

An IEP must provide an opportunity for more than "trivial advancement" and an appropriate public education under the IDEA is one that "is likely to produce progress not regression." *Mrs. B. v. Milford Bd. Of Educ.,* 103 F.3d 1114, 1121 (2d Cir.1997). However, an appropriate public education under the statute does not require the state to maximize the potential of handicapped children. *Walczak,* 142 F.3d at 130.

In making the comparison between the educational benefits that a child will receive in a regular classroom (with supplementary aids and services) and the benefits that the child will receive in the special education classroom, the Court must consider the setting in which the student will best be able to glean academic benefit as well as "those unique benefits the child may obtain from integration in a regular classroom which cannot be achieved in a segregated environment, i.e., the development of social and communication skills from interaction with nondisabled peers." *Oberti,* 995 F.2d at 1216.

Under the IDEA, disabled and nondisabled students need not receive the same academic experience. *A.S.,* 183 F.Supp.2d at 547. *A.S.* instructs that the Court's inquiry is whether the plaintiff, with appro-

priate support and services, can make progress toward his IEP goals in the regular education setting.

Plaintiff's evidence of his subsequent success in the mainstream program with appropriate supports is relevant to this consideration. *Roland M. v. Concord School Committee,* 910 F.2d 983, 991 (1st Cir.1990), *cert. denied,* 499 U.S. 912, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991) ("actual educational results are relevant to determining the efficacy of educators' policy choices."). Defendant has also provided evidence of plaintiff's success during his limited time in the special education program deemed appropriate by the hearing officer. The Court reviews this additional evidence, along with that in the record, giving due weight to the hearing officer's conclusion that plaintiff was more appropriately placed in the special education classroom.[3]

The hearing officer's conclusion that plaintiff would benefit from the proposed special education program has some basis in Dr. Thies' recommendation that plaintiff needed individualized instruction in a highly structured class with a highly structured curriculum, and a high teacher to student ratio. The hearing officer's conclusion is also consistent with the school psychologist's interpretation of Dr. Thies' report.

However, Dr. Thies' report does not recommend that plaintiff be placed in a special education placement such as the defendant's proposed IEP where plaintiff would be limited to instruction in "functional academics" or life skills. Dr. Thies' report indicates only that such individualized instruction is required for "all major, content subjects."

Significantly, the hearing officer's decision ignores Dr. Thies' observation that plaintiff had responded well to educational instruction, retained a learning capacity beyond his test scores, and would benefit from significant contact with mainstream peers. The hearing officer also discounted Dr. Itzkowitz's evaluation that plaintiff would benefit from an inclusive educational environment, particularly from contact with mainstream peers.

The school psychologist believed that no modifications could be devised to meet plaintiff's needs in the mainstream. However, her testimony revealed that she was not familiar with middle school classes.

The School Board provided no evidence that plaintiff would have meaningful contact with mainstream peers in the proposed special education program. At the same time, testimony given at the due process hearing indicated that plaintiff would not have meaningful contact with mainstream peers in that program.

Evidence concerning plaintiff's fifth grade year, in which he was largely placed in the special education multicategorical room, indicates that plaintiff made little academic progress, meeting less than one-third of the objectives set forth in his IEP. The School Board offered no evidence to demonstrate how the proposed IEP placement would better ensure plaintiff's educational progress.

Plaintiff's past inability to function in the mainstream does not demonstrate that plaintiff would not benefit from an appropriate placement with supports in the mainstream. *See Mavis v. Sobol,* 839 F.Supp. 968, 988–989 (N.D.N.Y.1993) (a disabled child's educational progress should not be compared to a nondisabled

---

**3.** The Court notes that the hearing officer did not specifically address the comparison of ed-    ucational benefits.

child). Instead, such testimony underscores the School Board's failure to comply with the IDEA by considering what aids and services may have facilitated his mainstream placement. Furthermore, some of the teachers, the science teacher excepted, testified that plaintiff was able to be paired with other children during certain class exercises, although plaintiff was not able to succeed academically. Plaintiff's parents testified that they had observed that plaintiff had benefitted from the interaction with his sixth grade mainstream peers.

The defendant's additional evidence of plaintiff's subsequent performance in the special education program, as ordered by the hearing officer, shows that plaintiff could have received some educational benefit from that placement. However, by comparison, plaintiff's additional evidence, including his teacher evaluations replete with praise of his academic and social success in the mainstream classroom with appropriate supports and aids, underlines that plaintiff benefitted in this placement beyond expectations set by the School Board or by the hearing officer.

Even without considering additional evidence of plaintiff's recent success, the review of the record demonstrates that plaintiff had not flourished during his fifth grade year in the special education multicategorical program, and that expert evaluators agreed that plaintiff needed meaningful social interaction with his mainstream peers. The additional evidence only clarifies that plaintiff did in fact greatly benefit from his placement in the mainstream with appropriate supports. Thus, a comparison of the educational benefits weighs against the placement ordered by the hearing officer, which limited plaintiff to a self contained special education program, and a curriculum of functional academics and life skills in all subjects except math and mainstream specials.

c. *The Possible Negative Effects of the Inclusion of the Child on the Education of the Other Students in the Class*

As the hearing officer's decision noted, the plaintiff's teachers testified to having experienced problems in teaching the plaintiff in the regular education classroom. Although the science teacher contended that plaintiff's participation was disruptive and presented dangers to the other students, the other teachers' testimony largely reflected difficulty in keeping the plaintiff focused, eliciting his participation, and conveying information to him. Some of the teachers also explained that modifications were required for testing the plaintiff. The Court notes that this evidence concerns plaintiff's behavior during an improper placement in the regular classroom, with an untrained paraprofessional, and without appropriate supports and modifications.

"In considering the possible negative effect of the child's presence on the other students, the court must keep in mind the school's obligation under the Act to provide supplementary aids and services to accommodate the child's disabilities." *Oberti*, 995 F.2d 1204. In this instance, no evidence in the record constitutes proof that plaintiff would present similar difficulties if provided with an adequate level of supplementary aids and related services in the regular classroom. Thus, this third factor also weighs against the defendant.

d. *Review of the Oberti Factors*

All three *Oberti* factors indicate that plaintiff's placement in the self contained special education program, as ordered by the hearing officer, fails to comply with the

IDEA's mainstreaming directive.[4] The School Board failed to provide evidence relative to (1) its consideration of reasonable support and services for a mainstream placement, (2) how plaintiff would progress or benefit from meaningful access to his mainstream peers if placed in a self contained special education program, or (3) the potential disruption or difficulties caused by plaintiff's placement in the mainstream with appropriate supports and services.

In light of the absence of this proof, the School Board failed to rebut the presumption of an appropriate mainstream placement, and the hearing officer's decision is not supported by the preponderance of evidence in the record. Thus, after due consideration, the Court rejects the hearing officer's material findings as to the plaintiff's placement. Although the hearing officer stated her intent to place the burden of proof on the School Board for compliance with the Act's mainstreaming requirement, it appears that she actually placed the burden of proof on the parents.

The additional evidence is relevant to this Court's consideration, in that it underscores the merit and prescience of Dr. Itzkowitz's and Dr. Thies' recommendations that plaintiff would benefit from meaningful contact with his mainstream peers. The Court rejects the hearing officer's finding that an appropriate mainstream placement would be "too overwhelming, too complex, too distracting, and requires too much of the student and the regular education teachers at this time."

Accordingly, the hearing officer's decision erred by placing plaintiff in the proposed special education program for all subjects except math, homeroom, lunch

and specials, and the Court will grant summary judgment in plaintiff's favor on this basis.

## C. *Hearing Officer's Procedural Errors*

■ Plaintiff also argues that the hearing officer's decision should be reversed based on procedural errors made by the hearing officer.

### 1. *Hearing Officer's Observation of the Student*

Plaintiff argues that the hearing officer's observation of the student in his regular education classes constitutes reversible error. Specifically, plaintiff asserts that the hearing officer's observation was, in effect, an *ex parte* meeting with employees of the board. Plaintiff claims prejudice and violation of due process because the hearing officer made her decision on information outside the record, and therefore not available to the reviewing court.

However, the Court notes that the hearing officer also observed the School Board's "multicategorical and special education classrooms" at the parents' request. Furthermore, the plaintiff cites no authority to support the assertion that the hearing officer is not permitted to observe students.

In light of the parents' request that the hearing officer conduct an observation of the school, which appears to be an implied waiver of any objection to such *ex parte* meetings, and the lack of authority for the asserted objection, the Court finds no error in the hearing officer's observation of the student in the mainstream class.

---

4. Since plaintiff's case has met the first prong of *Daniel R.R.*, the Court need not consider the second prong of the *Daniel R.R.* test (whether the child has been included in programs with nondisabled children whenever possible).

## 2. *Five Day Rule*

Plaintiff asserts that the hearing officer lacked discretion to admit the School Board's evidence that had not been disclosed five days prior to the hearing, as required by the Regulations of the Connecticut State Agencies, Section 10–76h-12(a), which Section provides:

> At least five business days prior to a hearing date scheduled and conducted pursuant to Section 10–76h–7 of the Regulations of Connecticut State Agencies, each party shall disclose to the other party all documentary evidence, including evaluations completed by that date, and recommendations based on the offering party's evaluations, that the party intends to use at the hearing. A hearing officer may bar any party that fails to comply with this requirement from introducing such evaluations or recommendations at the hearing.

Plaintiff argues that he had the right to prohibit such evidence pursuant to Section 10–76–11(a)(3) of the Connecticut State Agencies, which provides that "[a]ny party to a hearing conducted pursuant Section 10–76h–7 of the Regulations of Connecticut State Agencies has the right to .... [p]rohibit the introduction of any evidence at the hearing that has not been disclosed to that party at least five business days before the hearing...."

This Court disagrees with the plaintiff. As stated in her decision, the hearing officer has discretion with regard to the admission of evidence. Fed.Reg., Vol. 64, No. 48, p. 12614, March 12, 1999, Rules and Regulations.

The hearing officer interpreted the five-day rule to run from hearing date to hearing date, which interpretation of an agency regulation was reasonable and is entitled to deference. *See Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

## 3. *Forty Five Day Rule*

Plaintiff asserts that the hearing officer violated his rights by failing to render a decision within forty-five days as required by 34 C.F.R. Section 300.511(a), which provides:

> (a) The public agency shall ensure that not later than 45 days after the receipt of a request for a hearing—
>
> > (1) A final decision is reached in the hearing; and
> >
> > (2) A copy of the decision is mailed to each of the parties.

*See also* Conn. Gen.Stat. § 10–76h(b) [5].

Relief is warranted pursuant to this section only if violation of the forty-five day rule affected the student's right to a free appropriate public education. *J.D. v. Pawlet Sch. Dist.,* 224 F.3d 60, 69 (2d Cir.2000).

The first day of hearings in this case was not held until November 17, 1999, fifty-five days after the parents filed for due process. The hearing officer's decision was issued on May 3, 2000, which plaintiff asserts is 177 days beyond the 45-day limit.

Plaintiff claims that the extensive delay in obtaining a decision from the hearing officer deprived plaintiff of a free appropriate public education for seven months of his sixth grade school year. The Court notes that the hearing officer determined

---

**5.** Section 10–76h(b) provides:

> Upon receipt of a written request for a special education hearing made in accordance with subsection (a) of this section, the state department of education shall schedule a hearing which shall be held and the decision written and mailed within forty-five days of the receipt of the request for the hearing.

that the School Board had failed to provide the plaintiff with a free appropriate public education during the 1999–2000 school year. Accordingly, this Court agrees that the delay prejudiced the plaintiff. However, the Court need not consider whether the hearing officer's decision should be reversed on this basis, since the Court has already found that the hearing officer made a substantive error as to plaintiff's placement.

### D. *Violation of the FERPA*

■ Plaintiff's complaint alleges that the School Board violated the FERPA by (1) maintaining improper procedures for the dissemination of educational records, and (2) permitting the school psychologist to review records submitted by the plaintiff at the due process hearing. The hearing officer refused to rule on this issue for lack of jurisdiction.

Defendant asserts that summary judgment is proper on this claim, arguing that there is no private right of action under the FERPA. Plaintiff has presented no opposition.

In light of the merits of defendant's argument and the lack of opposition, the Court will grant summary judgment in the defendant's favor on this claim. *See Gonzaga University v. Doe,* —— U.S. ——, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002) (The FERPA does not provide the basis of a private right of action).

### *CONCLUSION*

For the foregoing reasons, the plaintiff's motion for summary judgment [doc. # 67] is GRANTED. The defendant's motion for summary judgment [doc. # 71] is DENIED in part, and GRANTED in part. Defendant's motion is granted only as to the plaintiff's claim of a FERPA violation.

The Court finds that the plaintiff's placement in the special education "multicategorical" program, as ordered by the hearing officer, does not comply with the IDEA's mainstreaming requirement. Accordingly, the hearing officer's decision is reversed as to her order that the plaintiff's IEP provide for placement in the special education "multicategorical" program, which order partly affirms the School Board's proposed IEP.

The clerk is instructed to close this case.