W.T. and K.T. on behalf
of J.T., Plaintiffs,

v.

**BOARD OF EDUCATION OF the
SCHOOL DISTRICT OF NEW
YORK CITY, Defendant.**

No. 09 Civ. 1368(FM).

United States District Court,
S.D. New York.

April 15, 2010.

Gary S. Mayerson, Mayerson and Associates, New York, NY, for Plaintiffs.

David Alan Rosinus, Jr., Michael Anthony Suarez, New York City Law Department, New York, NY, Emily Sweet, NYC Law Dept., Off. of the Corporation Counsel, Brooklyn, NY, for Defendants.

***MEMORANDUM DECISION***

FRANK MAAS, United States Magistrate Judge.

This suit, brought on behalf of J.T., a child with learning disabilities, by his parents, W.T. and K.T. ("Parents"), seeks review of a decision by the New York State Review Officer ("SRO"), which found in favor of the New York City Department of Education ("DOE") and denied reimbursement of J.T.'s private school tuition for the 2007–2008 school year.[1] The Parents have moved for modified *de novo* review of the SRO's decision, which is, in effect, a mo-

---

**1.** To preserve the child's privacy, I refer to him as "J.T.," throughout this decision, including where direct quotations use other names.

tion for summary judgment. (*See* Docket No. 11). The DOE has cross-moved for summary judgment dismissing the case in its entirety. (*See* Docket No. 21). For the reasons that follow, the DOE's motion is granted, and the Parents' motion is denied.

## I. *Background*

### A. *Statutory Framework*

In 1975, Congress enacted the Education for All Handicapped Children Act, Pub.L. No. 94–142, 89 Stat, 773 (1975) ("EAHC"), which was the precursor to the Individuals with Disabilities Education Act ("IDEA"), presently codified at 20 U.S.C. §§ 1400–1483.[2] In passing this legislation, Congress found that fewer than half of children with disabilities were receiving an appropriate education. *See* EAHC § 3(b). The purpose of the statute was to provide all children with disabilities with a free appropriate public education ("FAPE"). *Id.* § 3(c). To accomplish this goal, states are required to provide a minimum level of educational opportunities to all children with disabilities in order to receive federal financing. *See* 20 U.S.C. § 1412(a). Additionally, "[t]o the maximum extent appropriate, children with disabilities ... are [to be] educated with children who are not disabled." *Id.* § 1412(a)(5)(A).

The centerpiece of the IDEA is the Individualized Education Plan ("IEP"). The IEP is a "written statement for each child with a disability," which describes the child's present levels of achievement and performance, the child's measurable annual goals, and the special education and related services to be provided to the child. *Id.* § 1414(d)(1)(A). The IEP is developed by an "IEP Team," (known in New York as a Committee on Special Education ("CSE")), which ordinarily must include the child's parents, a regular education teacher,[3] a special education teacher, and a representative of the local educational agency. *Id.* § 1414(d)(1)(B). Section 615 of the IDEA provides parents challenging an IEP with comprehensive procedural safeguards, including the right to an impartial due process hearing before a local hearing officer and to further appellate review by a state educational agency. *Id.* § 1415(f)-(g). In New York, the local review takes place before an Independent Hearing Officer ("IHO"); the appeal is to the Office of State Review. N.Y. Educ. Law § 4404. After an SRO in that Office rules, either the parents or the school district may seek further review in a federal district court (or a state court of competent jurisdiction). 20 U.S.C. § 1415(i)(2); N.Y. Educ. Law § 4404(3)(a).

■ The parties agree that a district court presented with an IDEA case such as this one, in which parents seek judicial review of a decision denying tuition reimbursement under the IDEA, must consider whether (i) the IEP placement proposed by the school district was inappropriate, (ii) the parents' preferred placement was appropriate, and (iii) the equities favor the parents. (*See* Docket No. 13 (Parents Mem. at 16–17); Docket No. 23 (DOE Mem. at 2)) (both citing *Sch. Comm. of*

---

**2.** As part of major revisions in 1990, the EAHC was renamed the IDEA. *See* Education of the Handicapped Act Amendments of 1990, Pub. L. No. 101–476, § 901(a)(3), 104 Stat. 1103, 1142 (1990). In 2004, Congress made further amendments to the IDEA pursuant to the Individuals with Disabilities Education Improvement Act, which took effect on July 1, 2005. *See* Pub. L. No. 108–446, 118 Stat.

2647 (2004) ("IDEIA"). In keeping with most recent cases, I will continue to refer to the present statute as the IDEA.

**3.** As set forth below, a regular education teacher need not participate if the IEP Team is not considering the student for participation in regular education classes.

*Burlington v. Dep't of Educ.,* 471 U.S. 359, 369–70, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985)).

### B. *J.T.*

The following facts taken from the parties' Local Rule 56.1 statements and the administrative record are undisputed unless otherwise indicated.[4]

J.T. is an eleven-year-old child who has been classified as speech and language impaired since he was five. (Tr. 277). He was born on July 9, 1998, and thus was nine years old during the 2007–2008 school year. (*Id.* at 6).[5]

J.T. began receiving special services at a young age—including speech and occupational therapy and the services of a paraprofessional, who worked with J.T. at his preschool and for a few hours each week at home. (*Id.* at 277). Since kindergarten, J.T. has attended the Aaron School, a private school for students with special education needs. (*Id.* at 268).

When J.T. was a young child, his Parents and the staff at his preschool were concerned about his language skills, attention, and self-direction. (*Id.* at 245, 278). As a result, his Parents had him evaluated on several occasions by Dr. David Salsberg, a clinical psychologist. (*Id.* at 239, 245–46). Dr. Salsberg's written report, dated November 29, 2007, indicates that J.T.'s scores on an IQ test ranged from the fifth to the seventy-fifth percentile, with most of his deficits in the area of higher-level verbal comprehension. (*Id.* at 246–48). In areas such as categorizing pictures, visual reasoning, and patterns he scored in the high average range. (*Id.* at 248). The evaluation found that J.T.'s working memory was impaired, especially for auditory information and the processing of language. (*Id.* at 254). In working memory subtests, he scored in the fifth and sixteenth percentiles. (*Id.* at 255).

Socially, Dr. Salsberg found J.T. to be a "sweet, mild mannered child," who is inherently social and easily influenced by those around him, and who would follow other children in disruptive behaviors. (*Id.* at 252). J.T. also demonstrates a "propensity to withdraw into his own world." (*Id.* at 253). In self-esteem, he ranks in approximately the twelfth percentile. (*Id.* at 256).

### C. *IEP Development and Final Recommendation*

In May 2007, Beth Shatzkin ("Shatzkin"), a school psychologist, and Towanna Soto ("Soto"), a special education teacher, met to review J.T.'s file prior to a scheduled IEP team meeting. (Tr. 41–42). Together, they developed IEP goals for J.T. (*Id.*). Thereafter, on May 29, 2007, Soto, Shatzkin, the Parents, and a parent representative of the CSE attended the IEP meeting regarding J.T. (*Id.* at 16). Two staff members from the Aaron School, Erin Gallagher ("Gallagher"), J.T.'s speech pathologist, and Maxie Clark ("Clark"), J.T.'s special education teacher, also were present by telephone for at least a part of the IEP meeting. (*Id.;* Ex. 3 at 2(IEP)).[6]

At the meeting, the IEP Team recommended that J.T. be placed in a 12:1+1 special education class in a community

---

**4.** The copy of the administrative record furnished to the Court has not been redacted to mask J.T.'s true name but has not been docketed. In the event the Parents contemplate a further appeal, they should ensure that a properly-redacted copy of the administrative record is filed with this Court before the notice of appeal is filed.

**5.** "Tr." refers to the transcript of proceedings before the IHO.

**6.** "Ex." refers to the exhibits received in evidence during the administrative proceedings.

school, *i.e.*, a class of no more than twelve students taught by a special education teacher and a "paraprofessional." (Ex. 3 at 1; Tr. 18). Although the Parents did not see the proposed IEP during the meeting, a copy of the final version was mailed to them several weeks later. (Tr. 297). Neither the final IEP nor the discussion at the IEP meeting identified a specific school where J.T. might be placed. (*See* Ex. 3).

On August 1, 2007, the Parents received a Final Notice of Recommendation proposing that J.T. be placed at P.S. 2 in a self-contained 12:1 + 1 class. (*See* Ex. 5). On August 10, the Parents toured P.S. 2 and saw the proposed classroom. (Tr. 291–94). Unfortunately, because school was not in session, the Parents were unable to observe a class in progress. (*Id.* at 292). The Parents' attorney then sent a letter to the DOE on August 20, indicating that the Parents had rejected the proposed placement, were keeping J.T. at the Aaron School for the 2007–2008 school year, and intended to seek funding for that placement from the DOE. (*See* Ex. B) (Notice of Unilateral Placement, dated Aug. 20, 2007).

In September 2007, K.T., J.T.'s mother, visited P.S. 2 a second time in order to observe the class in which the DOE proposed to place J.T. (Tr. at 294). K.T. also was able to talk to Terence Sumner ("Sumner"), the teacher of the 12:1 + 1 class, about his class and J.T. (*Id.* at 295–302).

On October 19, 2007, J.T.'s parents filed an Impartial Hearing Request seeking reimbursement in the amount of $38,000 for J.T.'s Aaron School tuition for the 2007–2008 school year. (*See* Exs. 1, 11).

### D. *Proceedings before the IHO*
#### 1. *Hearing*

The hearing was held before IHO Craig Tessler on February 27, April 15, May 19, and June 4, 2008. (Tr. 1–314). Shatzkin, Soto, Sumner, and Brett Gustafson, the principal of P.S. 2 ("Gustafson"), testified for the DOE. (IHO Decision at 3–6). Tara Hawes ("Hawes"), J.T.'s teacher at the Aaron School, Dr. Salsberg, and K.T. testified for the Parents. (IHO Decision 6–8). The witnesses' testimony, to the extent relevant, was as follows:

#### i. *Shatzkin*

Shatzkin testified that the IEP Team classified J.T. with a speech and language impairment and recommended a 12:1 + 1 special class in a community school. (Tr. 18). She agreed with the team's placement recommendation because "[J.T.] could do well in a classroom with 12 students where the emphasis is on speech and language development, and he would fit in nicely to the program." (*Id.* at 19). As she explained, the team thought "that the environment was sufficient and small enough that it would provide a therapeutic setting in and of itself," without any need for counseling as an additional related service. (*Id.* at 22). The team also had considered a 12:1 program in a community school, but believed that such a placement was "inadequate to address his needs." (*Id.* at 24–25). In formulating the IEP, she and Soto relied heavily on reports from the Aaron School. (*Id.* at 31–32, 36–37, 41–43).

#### ii. *Soto*

Soto corroborated Shatzkin's testimony, but had little independent recollection of the IEP Team meeting by the time she testified in February 2008. (*Id.* at 47–70).

#### iii. *Gustafson*

Gustafson testified that, as of the date of the hearing, P.S. 2 had 748 students, eighty-three of whom received some type

of special education services. (*Id.* at 83, 86; Ex. 15 (Ethnic Census Report)). Included among these students were fifty enrolled in a Collaborative Team Teaching ("CTT") program,[7] twelve in the 12:1 + 1 class, and five who received only speech, physical, or occupational therapy. (*Id.* at 85–86). Gustafson said he reviewed J.T.'s IEP and sent it to Sumner, the 12:1+1 teacher, to make sure that this was an appropriate placement and that the school could provide the services listed on J.T.'s IEP. (*See id.* at 87–88).

### iv. *Sumner*

Sumner testified that he had been a teacher for one year before being assigned to the self-contained 12:1+1 class at P.S. 2 for the 2007–2008 school year. (*Id.* at 124). Sumner formerly was employed on Wall Street, had transitional certification, and was pursuing a master's degree in elementary and elementary special education through the New York City Teaching Fellows program. (*Id.* at 124–25).

When the 2007–2008 school year began, there were six students in his 12:1 + 1 class, ranging in age from eight to eleven years old. (*Id.* at 126–27). He testified that this age spread was a challenge he had overcome, explaining that,

> [a]t the beginning of the year [the difference in ages] was a concern of mine, and then as the year's evolved I've felt actually that it's more of a family atmosphere. The ... older children look out for the younger children. They develop familial relationships, sort of mentor-like relationships.

(*Id.* at 128). Sumner further testified that, at the time of the hearing, one student in his class was classified as "emotionally disturbed," four or five students were classified (like J.T.) as speech and language impaired, and the rest were classified as "learning disabled." (*Id.* at 128–129, 176).

At the time of the hearing, three students in Sumner's class were reading at a first-grade level, two at a second-grade level, three at a third-grade level, two at a fourth-grade level, and two at a fifth- to early sixth-grade level. (*Id.* at 129, 140–42). He thus estimated the range to be from about early first grade to early sixth grade, or approximately a five-year span. (*Id.* at 144). The highest functioning student, however, was mainstreamed in a fifth-grade reading class. (*Id.* at 149). In math, one student was at the first-grade level, another was at the second-grade level, another at the third-grade level, and the remaining nine were at the fourth-grade level.[8] (*Id.* at 129, 147).

When asked if he grouped the students functionally for instruction, Sumner testified that he did:

> In mathematics, the third grade student is mainstreamed, so he goes down to a third grade class. And then the other two students I put together, and it's sort of a two-tiered lesson. And then the remaining students work out of a fourth grade book.
>
> We all—we use the same curriculum .... the units parallel each other, so if I'm teaching a fractions unit, it might be unit six in the fourth grade text, and it might be unit seven in the third grade

---

**7.** A CTT class consists of a maximum of twenty-five students, no more than ten of whom are special education students, taught by two certified teachers, one of whom is a special education teacher. *See* Board of Education of the City of New York. *Special Education Services as Part of a Unified Service Delivery System,* at 31, available at http://www.schools. nyc.gov/Academics/SpecialEducation/Parent Resources/default.htm (last visited Apr. 13, 2010) (*"Special Education Services"*).

**8.** The student functioning at the third-grade level was mainstreamed in a third-grade math class. (*Id.* at 148).

text, but I will tier the lessons that way
. . . .

[In reading,] I have books that are levels from kindergarten all the way through the end of fifth grade in my classroom, and during reading time students choose books at their reading level, and then I conference with students.

I group them according to either their comprehension difficulties or their decoding difficulties, and I'm able to conference with two or three of them if they have a similar difficulty with understanding, say main idea . . . .

And in writing it can be the same concept. They can write a personal memoir, let's say we're doing that unit. And the expectation is that the student[s] who are more skilled in writing, the older students, might be writing, you know, a minimum of five paragraphs; whereas, I might expect the third grade students to write—or the ones that are functioning at a lower level to write one or two paragraphs.

(*Id.* at 129–31).

Sumner testified that the majority of his students received counseling during the 2007–2008 school year, including five who received one-to-one counseling. (*Id.* at 154–55). Additionally, four students had a diagnosis of ADHD. (*Id.* at 154). All of the children exhibited "acting out behaviors" to "one degree or another," but overall the class was a "well-behaved group, whose behavior ha[d] improved markedly over the course of the year." (*Id.* at 155). In Sumner's view, only one student could be seriously disruptive; nevertheless his disruptive behavior "ha[d] gone down considerably," although he still "occasionally ha[d] an episode." (*Id.* at 155–56). Sumner explained that he had a formal behavioral plan for the classroom at the beginning of the year, but no longer needed to use it because the students all had "fallen

into a good behavior pattern." (*Id.* at 157–58). He noted that one student who needed to move around during class was allowed to stand near his desk during lessons, but did not distract the other students. (*Id.* at 160).

Sumner opined that J.T. would have fit into his class well. (*Id.* at 136–37). Specifically, he noted that several existing students had the "exact same social/emotional management needs," and that J.T.'s present achievement level was "fairly similar" to four of the students. (*Id.* at 136). J.T.'s need for coding and decoding skills would have "[fallen] right in with a group[ ] of about four or five children," and "[h]is comprehension goals looked very similar to the comprehension goals of the other students in the class." (*Id.* at 137). With respect to math, J.T.'s skill level would have been "pretty much in line" with that of the other students in his class at the beginning of the school year. (*Id.*). Finally, Sumner stated that he had successfully helped other students who, like J.T., were easily distracted or would become anxious when frustrated. He did so by helping them gain confidence and building up their attention span by redirecting them and providing positive feedback. (*Id.* at 163–65).

v. *Hawes*

Hawes testified that the 2007–2008 school year was her fifth year as a head teacher and her second year teaching J.T. at the Aaron School. (*Id.* at 181). She described J.T. as a "friendly" and "social" student who required "teacher redirection throughout the day." (*Id.* at 185). She noted that J.T. was "able to initiate interactions with [other children]," but did not always share when he became frustrated with another child. (*Id.*). According to Hawes, J.T.'s "decoding" was at approximately a second-grade level, and his comprehension was at an early third-grade

level. (*Id.* at 187). His fluency was at an "end of third grade level." (*Id.*). He was at an end of third- to early fourth-grade level in math and was very strong in computation, but had difficulties with "problem solving." (*Id.* at 188–89). She noted that J.T. had a tendency to skip words that he did not understand, which impacted his ability to solve word problems. (*Id.* at 189). J.T. was functioning at an "early third to mid third" grade level in writing, and required considerable support because he had difficulties with organization. (*Id.*).

Hawes explained that her current class consisted of ten students, ranging in age from nine to ten. (*Id.* at 225). J.T. was similar to other students in her classroom, in that many of them also had learning disabilities and speech and language delays. (*Id.* at 187). Additionally, the reading, writing, and math skills of her students ranged from a third- to a fourth-grade level, which was very similar to J.T.'s level. (*Id.* at 190).

In Hawes' classroom, J.T. received "preferential seating," which enabled him to sit in the front. (*Id.* at 186). Hawes testified that she used "a lot of visuals" and "reminders" to help J.T. understand words in academic areas other than reading. (*Id.* at 188). In her view, J.T.'s greatest need was for a small class with considerable structure. (*Id.* at 191). She indicated that he also required encouragement and verbal reminders to participate during classroom discussions, prompting from teachers, and visual cues such as the "word walls" and "graphic organizers" in her class. (*Id.* at 191–92). In addition, Hawes used a sound system in the classroom to amplify her voice and help J.T. overcome his attention issues. (*Id.* at 192–93).

Hawes testified that J.T. was taught reading and math in small groups (consisting of five and six students, respectively), which were organized by the school administrator based on the students' progress during the prior year and results of their assessment tests. (*Id.* at 194–95).

Hawes considered the math goals for J.T. identified on the IEP inappropriate because he had already attained them by September 2007. (*Id.* at 219–20). She indicated that the reading goals on the IEP were appropriate, but that the comprehension goal seemed somewhat vague. (*Id.* at 221–22). She also considered his writing goals appropriate, although he had already accomplished some of the short-term goals.[9] (*Id.* at 222).

Finally, Hawes stated that J.T. could "possibly" benefit from counseling, noting that he was not receiving any at the Aaron School, but that it was an option she and others had recently discussed. (*Id.* at 230).

### vi. *Dr. Salsberg*

Dr. Salsberg testified that J.T. required a small, supportive, structured special education environment because "any degree of noise, chaos, movement, [or] other distractions" would accentuate the learning difficulties J.T. encountered in a classroom environment. (*Id.* at 250, 253). He testified further that J.T. needed to be placed with other children with language-based learning difficulties in a classroom where the teaching method and support were multi-sensory. (*Id.* at 251).

Dr. Salsberg did not consider the DOE's proposed placement appropriate for J.T. (*Id.* at 260–61). He expressed concern that much of the P.S. 2 class, according to

---

**9.** It is unclear whether Hawes believed that to be the case as of September or merely by the time of her testimony.

the class profile, was significantly older than J.T. (*Id.*). He further was concerned because the class did not appear to be aimed at children with speech and language impairments, but, rather, included children classified as emotionally disturbed or ADHD who would have "emotional and[/]or behavior issues." (*Id.* at 261). Indeed, he described it as "the exact opposite of a classroom where J.T. [would] make appropriate progress," suggesting that the placement might lead to emotional difficulties or regression. (*Id.*).

### vii. *K.T.*

K.T. testified that the IEP Team telephoned the Aaron School during its meeting, but because J.T.'s regular teacher was sick, Gallagher, the speech therapist, came to the phone as a substitute. (*Id.* at 280). After only a few questions were put to her, K.T. requested that one of J.T.'s teachers be summoned. (*Id.*). Clark, who was a curriculum coordinator and had been J.T.'s teacher the prior year then testified. (*Id.* at 280–81). According to K.T., although Clark provided input about J.T.'s classroom needs, including his need for steady guidance from the classroom teacher, the IEP Team did not ask her any questions. (*Id.* at 281, 286). K.T. testified that neither the IEP goals, nor any short-term objectives were discussed during the meeting. (*Id.* at 283). K.T. did not know who wrote the goals. (*Id.* at 283–84).

In mid-September 2007, K.T. visited the 12:1 + 1 class at P.S. 2. (*Id.* at 294). She described the scene in the classroom as "chaotic," with "kids running all over the class." (*Id.* at 295). She also noticed that another child had his head down on the desk with a hood over his head. (*Id.*). After another school employee came to take the students elsewhere, K.T. was able to talk to Sumner. (*Id.* at 295–96). They discussed how Sumner was able to teach students at multiple grade levels. (*Id.* at

297–98). After hearing his explanation, K.T. expressed concern that J.T. would be very bored if he had to listen to a first grade math lesson, noting that he tends to "go into la la land" when he gets bored. (*Id.* at 297).

K.T. stated that she and Sumner also discussed the behavioral demands of the children in his class, and how much they moved around the classroom. (*Id.* at 299–300). She said that Sumner explained that the students needed to move around because they spend a lot of time in the room. (*Id.* at 299). She nevertheless was worried that this would distract J.T. (*Id.*).

K.T. acknowledged that Sumner "seemed very gung ho[,] . . . like he really tried hard to work with [the students]." (*Id.* at 296). Her ultimate impression, however, was that such a chaotic environment with such a broad range of students was not appropriate for J.T. (*Id.* at 302). For that reason, K.T. kept J.T. at the Aaron School for the 2007–2008 academic year. (*Id.*).

### 2. *IHO Decision*

The IHO concluded that J.T.'s parents had met the burden of showing that they were entitled to tuition reimbursement for the 2007–2008 school year under *Burlington* and *Florence County School District Four v. Carter ex rel. Carter*, 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993). (IHO Decision at 9). (In *Carter*, the Supreme Court held that, pursuant to the IDEA, a parent who rejects an inappropriate public school placement may obtain reimbursement for an appropriate private school program even if it is not approved by the state agency. *Carter*, 510 U.S. at 9–10, 114 S.Ct. 361.)

The IHO found that the regulations promulgated by the New York State Education Department ("SED") mandated that the age range for students in special edu-

cation classes be no greater than thirty-six months, but that the "ages and performance levels of the students in the proposed class at P.[S.] 2 far exceed[ed] the permissible range." (IHO Decision at 10). On this basis, the IHO found that "the recommended placement was not appropriate, and constituted a denial of FAPE." (Id.). The IHO therefore did not consider the Parents' other allegations.

Turning to the second prong of the Burlington/Carter test, the IHO found that the Aaron School was an appropriate placement for J.T., even though it was not "SED-approved." (Id.). Specifically, he noted that the:

program offers a supportive, small class environment in a nurturing setting, with intensive instruction and supports, which J.T. requires to make progress. There is a low student-teacher ratio, and the other students in J.T.'s classes are of similar age, abilities and needs as J.T. J.T. receives the structure, individual and small-group attention, and learning strategies he requires; the staff regularly monitors students' progress and modifies their programs to suit their developing needs. The class is "wired" and J.T. has preferential seating, to address his attentional and focus issues. The program addresses J.T.'s particular learning problems, and uses his strengths in developing strategies. The program has therapeutic and social skills components, which are necessary to address J.T.'s timidity, low self-esteem, and other social/emotional issues.

(Id.)

Finally, with respect to the third requirement of Burlington/Carter, the IHO found that equitable considerations supported an award of tuition reimbursement. (Id. at 11). Specifically, he noted that there was "cooperation and communication between J.T.'s parents and the CSE, that the hearing request was timely, and that the amount of reimbursement sought [was] reasonable." (Id.).

### E. Proceedings before the SRO

On October 17, 2008, SRO Paul F. Kelly ("Kelly" or "the SRO") issued a decision reversing the IHO's tuition reimbursement award, in which he concluded that the DOE in fact had made a FAPE available to J.T. (SRO Decision at 1, 14).

In his decision, the SRO found that the range of the students in J.T.'s proposed class at P.S. 2 was not a problem because he "would have been functionally grouped with other similarly-aged students who had sufficiently similar instructional needs and abilities in both reading and math." (Id. at 11). The SRO went on to consider several other alleged defects in J.T.'s placement not specifically addressed by the IHO. Among other things, the SRO found, on the basis of Shatzkin's testimony, that the DOE did not inappropriately fail to offer counseling as a related service, because the proposed class "was sufficiently small enough to provide a therapeutic setting." (Id.). The SRO further found that the IEP meeting was not defective due to the absence of a general education teacher because the IEP Team never considered general education a viable prospect for J.T. for the 2007–2008 school year. (Id. at 12).

The SRO also rejected the parents' argument that the IEP was inadequate because the goals were "vague, generic[,] and did not provide a baseline." (Id. at 12). Although he found that the goals themselves "could have been more specific," the SRO concluded that the short-term objectives "clarified these goals, comprehensively addressed the student's needs, and were sufficiently detailed and measurable." (Id.). Similarly, the SRO found that the fact that the "method of measurement" for

the annual goals in the IEP was left blank did not deny J.T. a FAPE. (*Id.* at 13). As he explained, the hearing testimony indicated that the teacher implementing each goal would complete the method of measurement portion of the IEP in the course of assessing the student's progress over the year. (*Id.*). Additionally, the IEP stated that progress reports would be issued four times each year and listed "methods of measurement options." (*Id.*).

The SRO further found that the two Aaron School teachers had participated adequately in the IEP meeting by telephone and through their prior written reports. (*Id.*).

Finally, the SRO concluded that "the special education programs and related services recommended by the [DOE] in the May 29, 2007 IEP were reasonably calculated to confer educational benefits to the student, and thus, offered a FAPE to the student for the 2007–08 school year." (*Id.* at 14). Because the SRO concluded that the DOE had offered J.T. a FAPE, he did not consider the other two prongs of the *Burlington/Carter* test. (*Id.* at 15).

## II. *Discussion*

### A. *Standard of Review*

■ Although the Court is treating both parties' motions as motions for summary judgment, the Court's task in an IDEA case extends beyond the usual inquiry into whether there are disputed issues of material fact. Rather, such motions serve as a " 'pragmatic procedural mechanism' for reviewing a state's compliance with the procedures set forth in [the] IDEA and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits." *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 83 n. 3 (2d Cir.2005) (quoting *Warton v. New Fairfield Bd. of Educ.*, 217 F.Supp.2d 261,

270 (D.Conn.2002)). In substance, a summary judgment motion in an IDEA case constitutes an appeal from an administrative decision, in which the Court reviews the entire administrative record. *See id.* The Court then makes an "independent decision[ ] based on a preponderance of the evidence." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley*, 458 U.S. 176, 205, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) (internal quotation marks omitted) (quoting S. Conf. Rep. No. 94–455, at 50 (1975), *as reprinted in* 1975 U.S.C.C.A.N. 1503).

■ Independent review is not "an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.* at 206, 102 S.Ct. 3034. Thus, the Court "must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir.2009) (internal quotation marks and brackets omitted). Moreover, the Court must " 'defer to the final decision of the state authorities,' even where 'the reviewing authority disagrees with the hearing officer.' " *Id.* (emphasis added) (quoting *Karl ex rel. Karl v. Bd. of Educ. of Geneseo Cent. Sch. Dist.*, 736 F.2d 873, 877 (1984)). As the Second Circuit has made clear, it will not tolerate the reversal of an SRO's decision when it relates to a matter of educational policy. *See, e.g., Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir.2005) ("We have not hesitated to vacate district court opinions where the district court erred in substituting its judgment for that of the agency experts and the hearing officer.") (internal quotation marks omitted); *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d

377, 383 (2d Cir.2003) ("[T]he District Court impermissibly chose between the views of conflicting experts on a controversial issue of educational policy ... in direct contradiction of the opinions of state administrative officers who had heard the same evidence.").

## B. Alleged Bias of SRO Kelly

Perhaps recognizing the difficult threshold they must overcome to prevail on their IDEA claim, the Parents devote much of their argument to the contention that the SRO was biased and that the Court therefore should not defer to his decision. Specifically, the Parents suggest that SRO Kelly has a conflict of interest. (See Parents Mem. at 5, 7). They further have provided statistics which, in their view, show that the SRO votes in favor of the school district in most of the appeals that come before him. (See id. at 8–9).

### 1. Mayerson Affidavit

In support of their claim of bias, the Parents have submitted the affidavit of their counsel, Gary S. Mayerson, Esq. ("Mr. Mayerson"). (See Docket No. 12) (Aff. of Gary S. Mayerson, dated Aug. 4, 2009 ("Mayerson Aff.")). In his affidavit, Mr. Mayerson opines that the review mechanism of New York State "seemed to work well enough" when there were multiple SROs who were randomly selected to hear appeals. (Id. ¶ 16). More recently, however, although the number of appeals has been "perceived" as rising, there currently is only one SRO in the Office of State Review. (Id. ¶ 17). Kelly consequently hears all appeals from IHO decisions in New York State. (Id. ¶ 16).

Mayerson makes two principal points concerning Kelly's performance of his duties. First, he notes that an article in the Wall Street Journal on July 24, 2007, "raised serious questions concerning [Kelly's] impartiality, a potential conflict of interest in his living arrangements, ... and whether [he] was demonstrably biased in favor of school districts." (Id. ¶ 18). Specifically, the article noted that Kelly lives with Kathleen Surgalla, a senior SED attorney, in an Albany suburb, and that Surgalla has had some involvement with special education matters, including the training of IHOs, in the course of her work.[10] (Id. ¶¶ 18, 25–26 & Ex. D).[11] The article further stated that Kelly granted full or partial relief to school districts in eighty-six percent of their appeals in 2006 and 2007. (Id. Ex. D).

In an effort to build on prior studies, Mr. Mayerson evidently hired law student interns in the summer of 2009 to analyze 187 published SRO decisions issued between January 1, 2008, and June 29, 2009. (Id. ¶¶ 20–21). Their findings are summarized in his affidavit and an annexed spreadsheet. (Id. ¶¶ 28 & Ex. E). If accurate, the statistics certainly are remarkable. According to Mr. Mayerson, in reimbursement cases such as this one in which the IHO's decision is reversed, Kelly has ruled in favor of the school district ninety-eight percent of the time. (Id. ¶ 28). In reimbursement cases in which Kelly upholds the IHO, he has found in favor of the school district seventy-six percent of the time. (Id.).

On these bases, Mr. Mayerson argues that Kelly's decision-making reflects prob-

---

10. The SED oversees all aspects of education in New York State, from prekindergarten through college, and continuing education. See NYSED Program Offices, http://usny.nysed.gov/programs.html (last visited Apr. 13, 2010). With the exception of the New York State School for the Blind and the New York State School for the Deaf, SED itself does not operate any schools. Id.

11. The article also is annexed to the Complaint. (See Compl. Ex. C).

able, if not actual, bias and should have led Kelly to grant the Parents' request for his recusal. (*Id.* ¶¶ 28–29). In the alternative, Mr. Mayerson maintains that this Court should accept his affidavit as evidence of probable bias and therefore decline to defer to the SRO's decision. (*Id.* ¶¶ 29, 32),

### 2. *Motion to Strike*

The DOE has moved to strike both Mr. Mayerson's affidavit and the newspaper article and spreadsheet summary annexed thereto. (DOE Mem. at 20–23). The DOE contends that the affidavit contains "conclusory allegations and innuendo" concerning the SRO's romantic life and alleged propensity to "orchestrate his findings so that, at the end, the student always loses." (*Id.* at 21 (citing Mayerson Aff. ¶ 26)). The DOE further maintains, *inter alia,* that the portions of the affidavit based on statistics generated by Mr. Mayerson's interns are inadmissible because they rely on the conclusions of unidentified third parties rather than his own personal knowledge, are not part of the record below, and do not provide evidence sufficient for the Court to "test the validity of the 'data' contained therein." (*Id.* at 22).

Under Rule 56(e)(1) of the Federal Rules of Civil Procedure, an affidavit accompanying a motion for summary judgment must be based on personal knowledge, a standard not satisfied by statements made "upon information and belief." *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 138 (2d Cir.2009). Additionally, the affidavit must "set out facts that would be admissible in evidence." Fed. R.Civ.P. 56(e)(1): *see also Hollander v. Am. Cyanamid Co.,* 172 F.3d 192, 198 (2d Cir.1999) (*abrogated on other grounds* by *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 149, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). Accordingly, the statements that are based on inadmissible

hearsay or amount to conclusory legal arguments cannot be considered by the Court. *See, e.g., id.* ("court may therefore strike portions of an affidavit that … contain inadmissible hearsay"); *A.D. v. Bd. of Educ. of City Sch. Dist. of N.Y.,* 690 F.Supp.2d 193, 216–17 (S.D.N.Y.2010) (portions of affirmation which consist of legal argument or personal opinion will not be considered).

Several judges in this district and elsewhere have concluded that the *Wall Street Journal* article constitutes inadmissible hearsay. *See A.D.,* 690 F.Supp.2d at 217; *M.M. ex rel. A.M. v. N.Y. City Dep't of Educ. Region 9 (Dist.2),* 583 F.Supp.2d 498, 503 (S.D.N.Y.2008); *Student X v. N.Y. City Dep't of Educ.,* No. 07–CV–2316 (NGG)(RER), 2008 WL 4890440, at *4 n. 3 (E.D.N.Y. Oct. 30, 2008).

It appears that certain other parts of the Mayerson affidavit also are inadmissible. For example, the affidavit refers to the results of Google searches, which purportedly show that few parents or lam firms "have had much confidence in the integrity of … Kelly or the SRO appeal system." (Mayerson Aff. ¶ 19). The affidavit also contains other statements that either appear not to be based on Mr. Mayerson's personal knowledge or are conclusory. In one instance, Mr. Mayerson alleges, among other things, that:

> Ostensibly, each night, M[r]. Kelly has to come home to Ms. Surgalla. We believe that this relationship is why, as far as we can tell, Mr. Kelly apparently has developed a "no hitter" record in *Connors* funding cases. If you are student with a winning *Connors* decision, and the school district appeals your decision to Mr. Kelly, it is pretty much a foregone conclusion that one way or the other, Mr. Kelly will orchestrate his findings so that, at the end, the student always loses.

(Mayerson Aff. f 26). In its cross-motion, the DOE seeks to strike this material. (*See* DOE Mem. at 20–23).

The Parents might be able to overcome some of the DOE's evidentiary objections if Mr. Mayerson were shown to be qualified, by reason of "knowledge, skill, experience, training, or education" to testify as an expert witness. *See* Fed.R.Evid. 702. Also, 20 U.S.C. § 1415(i)(2)(C)(ii) provides that the Court "shall" consider additional evidence at the request of either party. The Court therefore is not limited to the record below. *See, e.g., Mavis v. Sobol,* 839 F.Supp. 968, 980 (N.D.N.Y.1993) ("As the parties know all too well, the educational issues which must be resolved in a case such as this are far from easy, and in the court's view any relevant evidence which would assist the court in deciding these issues should be considered."). Here, however, even if the Court were to consider all of the statements in the Mayerson affidavit, the Parents still would not be able to establish that Kelly suffered from a conflict sufficient to require recusal. There consequently is no need to consider the DOE's motion to strike the Mayerson affidavit.

### 3. *Bias under the regulations*

The sole authority the Parents cite in support of their recusal request is *Caperton v. A.T. Massey Coal Co.,* —— U.S. ——, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009). In that case, the chief executive officer of a corporation appealing the entry of a $50 million judgment against it spent considerable sums to elect to West Virginia's highest court a judge who might be disposed to look favorably on its appeal. *Id.* at 2256–57. The Supreme Court held that due process required the appellate

judge's recusal, even if no actual bias could be shown, given the extraordinary financial support provided for his campaign by the CEO. *Id.* at 2265. The Court further observed that because most recusal issues are decided based on codes of judicial conduct, "[a]pplication of the constitutional standard implicated in this case will ... be confined to rare instances." *Id.* at 2267.

■ In this case, the Parents do not challenge the administrative proceeding below on constitutional due process grounds. Accordingly, while the Supreme Court's discussion of bias in *Caperton* may be instructive, it does not set forth the applicable standard. That standard is instead found in a regulation promulgated by the State of New York. *See* N.Y. Comp.Codes R. & Regs. tit. 8, § 279.1(c). Insofar as relevant, that regulation mandates that an SRO have "no personal, economic, or professional interest in the hearing [the SRO] is assigned to review." *Id.* § 279.1(c)(4). Here, the closest that the Parents come to making a claim that the regulation was violated is Mr. Mayerson's contention that (if the *Wall Street Journal* article is correct) Kelly's current living arrangement with an SED attorney raises "serious questions concerning his impartiality." (*See* Mayerson Aff. ¶¶ 18, 25). Nevertheless, cohabitation with an SED employee—even one who has some involvement with special education issues—does not give Kelly a "personal" interest in J.T.'s case sufficient to warrant his disqualification under the New York regulation. There similarly is no basis to conclude that Kelly has an "economic or professional" interest in the outcome of the case that requires his recusal.[12]

---

12. Section 279.1(c) further provides that an SRO may not conduct a review "with respect to a hearing to which the [SED], or any educational program operated by the [SED],

is a party." § 279.1(c)(1). Pursuant to the regulation, an SRO also "shall not have jurisdiction to review the actions of any officer or employee of the [SED]." *Id.* § 279.1(c)(2). It

In sum, even though Kelly apparently lives with an SED attorney, his situation does not differ from that of a judge whose spouse is an attorney in private practice who regularly advances arguments germane to a case before the judge. While that understandably may be a cause for concern, it does not mandate disqualification unless the spouse (or the spouse's firm) represents one of the parties in the matter before the judge, has an interest that could be substantially affected by the outcome of the proceeding, or is likely to be a material witness. *See* Code of Conduct for U.S. Judges, Canon 3(C)(1)(d) (eff. Jul. 1, 2009). None of these showings has been made in this case.

 The only other "evidence" adduced by the Parents with respect to the disqualification issue is the statistical analysis undertaken by Mr. Mayerson and his legal interns. Assuming that this analysis is admissible, the statistics cited by Mr. Mayerson still do not warrant a finding that Kelly should have recused himself in this case. As the Second Circuit has noted in the context of federal judicial recusal:

> It seems evident that statistics alone, no matter how computed, cannot establish extrajudicial bias. There is no authority for, and no logic in, assuming that either party to a litigation is entitled to a certain percentage of favorable decisions. The inquiry to be at all meaningful would necessarily require this court to examine each and every ruling to determine whether it was, initially, legally valid. If we determined that some adverse rulings were correctly made, obvi-

ously they could not be tainted by bias. Even if they were deemed to be incorrect, it of course does not follow that they were motivated by personal bias. *United States v. Int'l Bus. Machs. Corp. (In re Int'l Bus. Machs. Corp.)*, 618 F.2d 923, 930 (2d Cir.1980). Thus, while Mr. Mayerson's statistics might bolster a claim of bias, the party alleging bias must first establish a basis for the bias. Here, the requisite showing has not been made.[13]

### C. *Tuition Reimbursement Under the IDEA*

In their initial memorandum of law seeking reversal of the SRO decision, the Parents focused on two issues: the absence of a regular education teacher at the IEP Team meeting and the range of ages of the students in the proposed class. The DOE therefore suggests that any additional issues that were raised below, but not addressed in the Parents' initial memorandum of law, should be deemed abandoned. (*See* DOE Mem. at 12). In their reply memorandum, the Parents dispute that there are such issues, contending that they raised additional objections to the SRO's findings by noting in their initial submission to this Court that the "IEP reflected significant procedural and substantive defects, including but not limited to, the composition of the team at the May 29, 2007 meeting, inadequate annual goals, and failure of the IEP Team to consider counseling for J.T. despite noticing his problems with focusing and impulsivity." (Parents Reply Mem. at 5). While that is literally true, the Parents failed to develop these arguments in either of their memoranda.

is undisputed that Surgalla had no involvement in any proceedings involving J.T. Accordingly, Kelly did not violate either of these provisions.

13. Mr. Mayerson remains free to challenge the regulation governing appointment of SROs and their recusal criteria in a separate

proceeding in either state or federal court. *Cf. Heldman ex rel. T.H. v. Sobol*, 962 F.2d 148, 151 (2d Cir.1992) (concluding that the father of a special education student had standing to challenge New York regulations governing how SROs are chosen).

They apparently believe that there is no need to do so since the burden is on the DOE to prove that it offered J.T. a FAPE. (*See id.*).

In *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005), the Supreme Court held that the burden of persuasion in an IDEA case is on the party seeking review, which is usually, as in this case, the parents. That decision left unresolved whether a state can overrule that allocation of the burden by statute. Subsequently, New York has attempted to shift that burden pursuant to New York Education Law Section 4404(1)(c). *See Student X.* 2008 WL 4890440, at *2 n. 2. Regardless of who has the burden of proof, it is clear that the DOE prevailed at the SRO level. Additionally, as the case law makes clear, the Court must defer to the SRO. It thus is incumbent upon the Parents to bring to the Court's attention any procedural or substantive flaws and explain why they allegedly warrant reversal. Here, with the exception of their arguments related to the composition of the IEP Team and the age range of students in the proposed class placement, the Parents have not done so. Nevertheless, I will briefly consider each of the issues raised by the Parents at the administrative level, not just the issues that were fully briefed before this Court.

As noted earlier, the Supreme Court has articulated a three-prong test for determining whether parents are entitled to tuition reimbursement under the IDEA. *Burlington,* 471 U.S. at 370, 105 S.Ct. 1996: *see also Carter,* 510 U.S. at 15–16, 114 S.Ct. 361. First, a court must determine whether the IEP proposed by the school district was appropriate. *Id.* at 15, 114 S.Ct. 361. If the IEP was inappropriate, the Court then considers whether the private placement was appropriate to the child's needs. *Id.* Finally, "because the

authority to grant reimbursement is discretionary, 'equitable considerations [relating to the reasonableness of the action taken by the parents] are relevant in fashioning relief.'" *Frank G. v. Bd. of Educ. of Hyde Park,* 459 F.3d 356, 363–64 (2d Cir. 2006) (internal quotation marks omitted) (quoting *Burlington,* 471 U.S. at 374, 105 S.Ct. 1996).

Turning to the first prong of the *Burlington/Carter* test—whether the school district offered a FAPE to J.T.—it is appropriate to consider first whether the school district complied with the procedural protections of the IDEA. *Cerra,* 427 F.3d at 192. If so, the court must also determine whether the IEP is "substantively appropriate in that it is 'reasonably calculated to enable the child to receive educational benefits.'" *T.P. ex rel S.P. v. Mamaroneck Union Free Sch. Dist.,* 554 F.3d 247, 252 (2d Cir.2009) (quoting *Cerra,* 427 F.3d at 192). I will consider each of these questions in turn.

### 1. *Procedural Compliance*

 "The initial procedural inquiry in an IDEA case 'is no mere formality,' as 'adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.'" *T.P.,* 554 F.3d at 252–53 (quoting *Walczak v. Fla. Union Free Sch. Dist.,* 142 F.3d 119, 129 (2d Cir.1998)). Accordingly, although a material violation of the procedural requirements may result in the denial of a FAPE, it does not follow that every procedural violation will automatically render the IEP legally inadequate under the IDEA. *A.C.,* 553 F.3d at 172.

### i. *Regular Education Teacher*

 Turning first to the claim that the IEP was procedurally defective because there was no regular education teacher at the IEP Team meeting, the IDEA pro-

vides that such a teacher must be part of the IEP Team "if the child is, or may be participating in the regular education environment." 20 U.S.C. § 1414(d)(1)(B)(ii). Although the Parents maintain that the SRO improperly put the burden on them to show that the lack of a regular education teacher impeded J.T.'s right to a FAPE, (Parents Mem. at 19), there is nothing in the administrative record to suggest that anyone seriously thought that J.T. should be considered for a regular education environment. Accordingly, regardless of who had the burden, the SRO was correct in stating that "there was no necessity for a regular education teacher at the ... meeting because [J.T.] was not participating in a general education program at the time and was not being considered for placement in a general education program during the 2007–08 school year. (*See* SRO Decision at 12).[14]

### ii. *Participation of Aaron School teachers*

■ In prior proceedings, the Parents also alleged that the Aaron School teachers did not participate adequately in the IEP Team meeting. In that regard, K.T. testified before the IHO that Gallagher, the speech therapist at the Aaron School, participated by telephone because J.T.'s regular teacher was sick. According to K.T., Gallagher was on the call for only a few minutes until she located Clark, who was J.T.'s teacher the previous year. (Tr. 280). K.T. testified that while Clark provided input regarding J.T.'s needs, the IEP Team did not engage her by asking any questions. (*See id.* at 286). On the other hand, Soto, the special education teacher member of the IEP Team, testified that both Gallagher and Clark were on the phone for the entire call. (*Id.* at 60). Regardless of the duration of the Aaron School teachers' participation in the IEP Team meeting, all of the parties apparently agree that Soto and Schatzkin developed the IEP based primarily on written reports from the Aaron School. Thus, even if Gallagher and Clark made only cameo appearances during the IEP Team meeting, it was reasonable for the SRO to find that personnel from the Aaron School participated adequately in the development of the IEP.

### iii. *Inadequate Annual Goals*

■ The Parents argued during the administrative proceedings that the annual goals in the IEP were vague and generic. (*See* SRO Decision at 12). In that regard, the IDEA requires that an IEP contain "a statement of measurable annual goals, including academic and functional goals." 20 U.S.C. § 1414(d)(1)(A)(i)(II). The IEP also must include "a description of how the child's progress toward meeting the annual goals ... will be measured and when periodic reports on the progress the child is making toward meeting the annual goals ... will be provided." *Id.* § 1414(d)(1)(A)(i)(III). Here, the IEP contained such goals as "[s]tudent will improve communication skills" and "[s]tudent will improve pragmatic language skills." (Ex. 3 at 6). In his decision, the SRO agreed with the Parents that the goals set forth in the IEP left something to be desired, but found that they were clarified by the forty-six short-term objectives included in the IEP. (SRO Decision at 12).

14. K.T. testified that she questioned Sumner about the possibility of J.T. participating in a CTT math class during her visit to P.S. 2. (*See* Tr. at 300). A CTT class is intended to integrate special education students into regular education classes. *See Special Education Ser-* *vices* at 31. However, the mere fact that K.T. made this inquiry does not mean that she or anyone else considered J.T. a candidate for regular education. Indeed, the entire premise of the Parents' lawsuit is that he required a highly specialized environment.

This finding is supported by the record since the short-term objectives included under each goal set forth specific evaluative criteria. For example, the IEP requires that J.T. "state the correct operation to be used in each of 7 out of 10 word problems" at the next grade level and "write at least 8 of 10 sentences containing appropriate capitalization and punctuation." (Ex. 3 at 7, 9).

The Parents also argued to the IHO and the SRO that the IEP was inadequate because the measurement method box for each goal was left blank. (*See* Ex. 1 at 3; SRO Decision at 13). Indeed, only the left side of the "Annual Goals and Short Term Objectives" section of the IEP form was completed. The form also indicates that there will be four progress reports each year. (Ex. 3 at 6–12). Although the right side of the form contains a box for each such report period labeled "Method of Measurement," no information was filled out. At the bottom of each page of goals and objectives, there is a coding key which gives nine numbered options, including "Teacher Made Material," "Standardized Test," "Class Activities," "Portfolio," "Teacher/Provider Observation," "Performance Assessment Task," "Check Lists," "Verbal Explanation," and "Other (specify)." (*Id.*). It therefore appears that the IEP Team could have completed this part of the form simply by identifying by number a measurement option for each goal.

The IDEA indicates that the measurement of goals should be a part of the IEP and, thus, completed in advance. *See* 20 U.S.C. § 1414(d)(1)(A)(i)(II) (IEP includes "a description of how the child's progress towards meeting the annuals goals ... will be measured"). Here, the IEP Team did not select a number specifying the type of measurement that would be undertaken. In his decision, the SRO did not suggest

that this constituted compliance with the IDEA, but stated that the hearing record nevertheless "shows that there was no denial of a FAPE as a result." (SRO Decision at 13).

As noted previously, because compliance with the IDEA procedures is not a "mere formality," a significant violation may result in the denial of a FAPE. *See Grim,* 346 F.3d at 381. Here, however, the SRO noted that, according to Shatzkin and Sumner, "the teacher implementing the goal would fill out the method of measurement portion of the IEP when assessing the student's progress over the course of the school year." (SRO Decision at 13). The SRO further noted that Sumner had "specifically testified that he assessed students to [e]nsure they were working at their goals and that these assessments would occur with each concept worked on." (*Id.* at 13). In light of the uncontradicted testimony, which shows that there would be periodic evaluations of J.T.'s progress toward his goals, the SRO's finding that the failure to fill out the method of measurement in advance did not rise to the level of a material procedural violation that would deny J.T. a FAPE is entitled to deference.

### iv. *Failure to Discuss Proposed Placement with the Parents*

In their reply memorandum, the Parents argue for the first time that the DOE violated a consent order entered in a different case in the Eastern District of New York by suggesting a school placement without first discussing the proposed placement with the Parents. (Parents Reply Mem. at 3 & n. 3). The Second Circuit recently held, however, that the DOE is not required to list a specific school placement on the IEP. *T.Y. v. N.Y. City Dep't of Educ.,* 584 F.3d 412, 419–20 (2d Cir.2009).

There consequently does not appear to be any basis for this claim.[15]

### 2. *Substantive Complaints*

 "An appropriate public education under [the] IDEA is one that is 'likely to produce progress, not regression.'" *Walczak*, 142 F.3d at 130 (quoting *Cypress–Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 248 (5th Cir. 1997)). Thus, an IEP must be reasonably calculated to lead to non-trivial academic advancement. *Id.* As the Supreme Court has emphasized, an "appropriate education" does not require the school to "maximize the potential" of students with disabilities. *See Rowley*, 458 U.S. at 189, 197 n. 21, 102 S.Ct. 3034 (1982). Rather, because the focus is on equal access, the education offered must merely provide a meaningful opportunity for advancement. *See id.* at 198–204, 102 S.Ct. 3034; *Bay Shore Union Free Sch. Dist. v. Kain*, 485 F.3d 730, 733 (2d Cir.2007) (states must provide disabled students a "basic floor of meaningful, beneficial educational opportunity").

#### i. *Age and Achievement Levels of Proposed Class*

 The Parents' primary substantive complaint is that the DOE's proposed placement at P.S. 2 would have put J.T. in a class whose students had an age range greater than thirty-six months and an even greater range of academic achievement, in violation of the New York State regulations. Those regulations require that students in special education be grouped together "by similarity of individual needs" and that "[t]he range of academic or educational achievement of such students ... be limited to assure that instruction provides each student appropriate opportunities to achieve his or her annual goals." N.Y. Comp.Codes R. & Regs. tit. 8, § 200.6(a)(3). The regulations further require that the composition of special education classes be based upon the students' similarity in terms of their levels of academic achievement, social and physical development, and management needs. *Id.* § 200.6(h)(2). Finally, the regulations provide a bright-line rule that the age range of students in special education classes who are less than sixteen years old shall not exceed thirty-six months. *Id.* § 200.6(h)(5).

Notably, while New York State is responsible for implementing the IDEA, the Second Circuit has held that a violation of its regulations does not automatically amount to a violation of the IDEA. *See A.C.*, 553 F.3d at 172 ("Assuming such a violation [of a New York regulation] may have occurred, the violation of such a regulation does not compel the conclusion that the ... IEP was legally inadequate."); *see also Bay Shore Union Free Sch. Dist.*, 485 F.3d at 734 (whether school district followed New York education law is a question separate from whether it provided a FAPE).

It is unclear from the record whether the students in the proposed class at P.S. 2 exceeded the permissible thirty-six month age range since Sumner only described their ages at the beginning of the 2007–

---

**15.** To the extent that the Parents are alleging a violation of a consent order in a separate proceeding, they might be better advised to seek relief from the court that entered that order. *See* Fed.R.Civ.P. 4.1 advisory committee's note ("Contempt proceedings, whether civil or criminal, must be brought in the court that was allegedly defied by a contumacious act."); *see also Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) ("civil contempt proceedings leave the offended judge solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct").

2008 school year as from eight to eleven. (Tr. 127; SRO Decision at 8 n. 7). Even if this did not violate the regulation, it obviously was pushing the limits. Moreover, the academic levels of the students in the proposed class spanned as much as five years at points during the school year, with students in both reading and math functioning at the first and second grade levels.

The SRO held that a violation of the regulation, even if established, would not make the placement unlawful. (SRO Decision at 8–9). In making this determination, he noted past SRO decisions had held that an age range exceeding thirty-six months does not deny a special education student a FAPE as long as the students in the class are "appropriately grouped within the class for instructional purposes." (*Id.* at 8). At least one court in this Circuit similarly has held that such a violation does not deny a student a FAPE. *See Connor ex rel. I.C. v. N.Y. City Dep't of Educ.*, No. 08 Civ. 7710(LBS), 2009 WL 3335760, at *6 (S.D.N.Y. Oct. 13, 2009) ("If a classroom composition exceeds the thirty-six month range, but the students were properly grouped together on factors other than chronological age the grouping is acceptable."); *see also Wall by Wall v. Mattituck–Cutchogue Sch. Dist.*, 945 F.Supp. 501, 505, 511 (E.D.N.Y.1996) (student with lowest scores in reading but at top of class in other areas was adequately grouped with similar students).

In his decision, the SRO concluded that there was no FAPE denial because "the hearing record supports a finding that [J.T.] would have had an appropriate age peer group *within* the proposed class." (SRO Decision at 8) (emphasis added).

The SRO also compared J.T.'s functioning level, based on the testimony of Dr. Salsberg and Hawes, with the reading and math levels of the special education class described in the class profiles submitted to the IHO and in the testimony of Gustafson and Sumner. (*Id.* at 9–11). The SRO found that, without exception, there were other students in the class near the same level as J.T. (*Id.*). The SRO noted that the same was true with respect to J.T.'s level of cognitive abilities, communication and language skills, and social skills. (*Id.* at 10–11). Finally, the SRO noted Shatzkin's testimony that the 12:1 + 1 program was "geared toward" children with speech and language needs,[16] and that four or five other students in the class had a similar disability. (*Id.* at 11). The SRO concluded that J.T. "would have been functionally grouped with other similarly-aged students who had sufficiently similar instructional needs and abilities in both reading and math." (*Id.*).

In sum, the SRO concluded that J.T.'s proposed classmates were sufficiently similar—in terms of chronological age, cognitive abilities, and skills—because a subset of them were comparable to him. This conclusion is troubling for at least two reasons.

First, the SRO's decision substitutes the views of a single administrative judge for those of the SED arrived at through a regulatory process. Second, the SRO's reasoning renders the SED regulations largely a nullity in any situation in which a handful of students are roughly comparable to the student seeking administrative review. Thus, a student will be deemed to have been afforded a FAPE even if he and the handful of students comparable to him are placed in a class with numerous outli-

---

**16.** Counsel for the Parents asked Shatzkin, "So the 12:1[+] 1 program you were thinking about, that you actually recommended was geared towards speech and language needs

children?" (Tr. 29). She responded, "Right. Yes, it would be, yes." Shatzkin did not say that Sumner's class, in fact, was so geared. (*Id.*).

ers in terms of cognitive ability, skills, and management needs. This heightens the risk that the teacher(s) in the class will have to spend substantial time with the outliers or gear the class to the lowest common denominator, results that the regulation presumably was intended to avoid.

█ That said, through its decisions the Second Circuit has expressed considerable deference to SROs in IDEA cases, particularly where the SRO decision is, as here, detailed and reasoned. *See, e.g., Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir.2007) (federal review is "circumscribed"); *T.Y.*, 584 F.3d at 419 ("thorough and well-reasoned" SRO decisions require deference). Indeed, the Second Circuit seems to have gone so far as to suggest that this Court must defer to the SRO on any issue that could possibly be construed as a matter of contested educational policy. *See, e.g., Grim*, 346 F.3d at 380–81 (district court, which found after holding its own evidentiary hearing that appropriate consideration had not been given to educational experts during administrative hearings, impermissibly reversed SRO). I therefore reluctantly conclude that I must defer to the SRO's substantive determination that the broad range of ages and performance abilities in the class proposed by the DOE did not deprive J.T. of a FAPE.[17]

ii. *Failure to recommend counseling as a related service*

█ In their papers, the Parents also suggest (in passing) that the proposed IEP was substantively inadequate because it failed to recommend that J.T. receive counseling as a related service. (*See* Parents Mem. at 11). The Parents alleged at the administrative level that counseling was necessary based upon J.T.'s tendency to lose focus, start activities impulsively before completely processing directions, become frustrated after making mistakes, and display anxiety about being wrong, as well as his difficulty in the area of self-regulating his sensory processing needs. (*See* SRO Decision at 11).

In his decision, the SRO noted that J.T.'s IEP included goals and objectives to address these needs, and that Sumner had testified very specifically about how he would address these issues within the class. (*Id.*). Moreover, Shatzkin, the DOE psychologist, testified that the IEP Team did not believe J.T. required counseling "because of the progress [he] had made and [the fact] that the placement being recommended ... was sufficiently small enough to provide a therapeutic setting." (*Id.*). Hawes also testified in May 2008 that J.T. was not receiving counseling at the Aaron School; indeed, J.T.'s teaching team had only recently discussed whether counseling might be appropriate for J.T. (*See* Tr. 230).

There consequently is no reason to question either the SRO's or the IEP Team's finding that J.T. did not require counseling as an additional related service in order to make academic progress in the proposed

---

17. The Court of course must determine the appropriateness of a placement prospectively, without the benefit of a school year's worth of hindsight. *See Antonaccio v. Bd. of Educ. of Arlington Cent. Sch. Dist.*, 281 F.Supp.2d 710, 724 (S.D.N.Y.2003). This, after all, is the issue the Parents faced when they received the proposed IEP. While the Parents did not know the exact age range of the children in the 12:1 + 1 class prior to the IHO hearing,

K.T. indicated that when she visited the classroom the children seemed to range from "as tell as [herself]" to "little boys who looked like they were about five," and this concerned her greatly. (Tr. 302). It bears mention, however, that Sumner did an admirable job during the 2007–2008 school year, notwithstanding the problems presented by the diverse group of students assigned to his class.

placement. Indeed, there is no evidence that either the Parents or any of their witnesses considered it essential that J.T. receive such counseling. It follows that the SRO was fully justified in concluding that counseling was not required to provide J.T. with a FAPE.

III. *Conclusion*

For the foregoing reasons, the DOE's motion for summary judgment (Docket No. 21) is granted, the Parents' motion for modified *de novo* review (Docket No. 11) is denied, and the Clerk of the Court is respectfully requested to close this case.

SO ORDERED.